STATE of Wisconsin, Plaintiff-Respondent,

v.

Kevin C. CROWLEY, Defendant-Appellant-Petitioner.

Supreme Court

*No. 86–0432–CR. Argued January 6, 1988.—Decided April 6, 1988.*

(Also reported in 422 N.W.2d 847.)

For the defendant-appellant-petitioner there were briefs and oral argument by *Charles Bennett Vetzner,* assistant state public defender, Madison.

For the plaintiff-respondent the cause was argued by *Christopher G. Wren,* assistant attorney general, with whom on the brief was *Donald J. Hanaway,* attorney general.

HEFFERNAN, CHIEF JUSTICE. This is a review of a decision of the court of appeals[1] which affirmed the conviction of Kevin C. Crowley (Crowley) in the circuit court for Crawford county, Michael Kirchman, circuit judge, for the crime of aggravated battery, in violation of sec. 940.19(3)(b), Stats. We affirm the decision of the court of appeals.

Section 940.19(3)(a) and (b), Stats., provides:

> "(3) Whoever intentionally causes bodily harm to another by conduct which creates a high probability of great bodily harm is guilty of a Class E[2] felony. A rebuttable presumption of conduct creating a high probability of great bodily harm arises:
>
> "(a) If the person harmed is 62 years of age or older; or
>
> "(b) If the person harmed has a physical disability, whether congenital or acquired by accident, injury or disease, which is discernible by an ordinary person viewing the physically disabled person."

Crowley was found guilty by a jury of aggravated battery of the person of Billy Zinkle, who was forty-eight years old, weighed 96 pounds, was 4 feet 9 inches in height, and was legally blind. His vision was to

---

[1] *State of Wisconsin v. Kevin C. Crowley,* 140 Wis. 2d 862, 411 N.W.2d 428 (Ct. App. 1987).

[2] Sec. 939.50(3)(e), Stats., provides the punishment for conviction of a Class E felony to be, "a fine not to exceed $10,000 or imprisonment not to exceed 2 years, or both."

some degree correctible by glasses, which were described as "quite thick" and as "heavy cataract lenses" which magnify an object four times.

The contention of the state is that Zinkle had a physical disability as set out in the statute and, therefore, the presumption stated in sec. 940.19(3)(b), Stats., is applicable. It also attempted to prove directly that Crowley's conduct created a high probability of great bodily harm.

At this point in the chronology of the case, giving credence to the jury verdict as we must, it is apparent that Crowley was the assailant who intentionally caused bodily harm to Billy Zinkle.[3] What remains to be decided in this court is whether, given the facts, Billy Zinkle had a physical disability that would trigger the presumption. If so, given the fact of intent to inflict bodily harm on a disabled person, it is presumed that the conduct was such that it created a high probability of great bodily harm. The state has relied upon this presumption. It has also attempted to prove, by what it refers to as direct evidence, that Crowley's actual conduct created a high probability of great bodily harm. Thus, it appears that the state has relied upon alternate grounds to prove guilt, as it indeed may do under the statute. It attempted to prove by "direct" evidence that the conduct of Crowley created a high probability of great bodily harm. It also attempted to show that Billy Zinkle had a "physical disability" and, therefore, the intentional infliction of bodily injury triggered the presumption that the conduct created a high probability of great bodily harm.

---

[3] In the circuit court, all the elements of the crime, including the identity of the assailant, were contested.

The court of appeals concluded that the proof by direct evidence was sufficient beyond a reasonable doubt[4] and, therefore, concluded that it was unnecessary to determine whether the evidence was also sufficient to sustain a finding of guilt beyond a reasonable doubt upon the presumptive rationale. We conclude that, when alternative methods of proof resting upon different evidentiary facts are presented to the jury, it is necessary, in order to sustain a conviction, for an appellate court to conclude that the evidence was sufficient to convict beyond a reasonable doubt upon both of the alternative modes of proof. Thus, we disagree with the court of appeals rationale that, there being sufficient direct proof, the sufficiency of the evidence under the statutory presumption need not be examined. Both must be looked to. We conclude, however, that the evidence was sufficient on each of the alternatives, and accordingly we affirm the decision of the court of appeals, which affirmed the conviction of guilt.

---

[4]Because the court of appeals has found the direct evidence is sufficient to prove guilt beyond a reasonable doubt, we ordinarily would make no further inquiry into the sufficiency of the evidence. Because defendant on this appeal argues that there are legal considerations involved in this determination, we address the question of the sufficiency of the direct evidence hereafter. We emphasize that the court of appeals relied upon the testimony of a physician who testified that the "injuries that [Zinkle] received would ... create a high probability of death." From this the court of appeals constructed a presumption that these injuries, which were indeed serious, were caused by conduct that created a high probability of great bodily harm. We do not disagree with the court of appeals' *ipse dixit* conclusion, but we believe the methodology for arriving at that conclusion requires explication. We do so, *infra*.

The basic facts of the case are these. On April 30, 1985, Billy Zinkle (Billy) was drinking in a tavern about two miles from his home in rural Stueben, Wisconsin. Billy testified that, while he was sitting at the bar, Kevin Crowley, a physically healthy, normal-sized eighteen-year-old, came to the tavern door and demanded that Billy come out "right now" or he, Crowley, would "get" him later. Billy had previously been assaulted by Crowley, because, Billy thought, he had refused to allow Crowley to use Billy's home for parties. Billy did not react to Crowley's threat and stayed until closing time, when he commenced walking home.

There was expert opinion at trial that, when Billy left the tavern, he was legally intoxicated. When about half-way home, he was accosted by persons who drove up in a car. One person slapped him on the back and announced, "I'm Crowley." At this point, either Crowley removed Billy's glasses or, at Crowley's direction, they were removed by a mentally-retarded companion of Crowley named Allan Millikin. Billy testified that Crowley stated, "I don't want to break another pair." Crowley then hit Billy two or more times in the face. Billy was knocked down and does not recall what happened except that someone took him home, put him to bed, and gave him a drink of water.

Billy remained at home for the next few days, throwing up, unable to eat, and with pain throughout his body. He experienced shortness of breath—he previously had been diagnosed as having some heart problem. One eye was completely swollen shut. When he failed to answer his telephone, his family became concerned, went to his home, and found him in a battered condition.

Crowley was charged with aggravated assault of a disabled person, contrary to sec. 940.19(3)(b), Stats.

Evidence adduced showed that Zinkle was indeed legally blind without his glasses. A courtroom demonstration showed he could not recognize his own cousin until he came within 6 to 12 inches of Billy's face. He could not tell from the witness box that there was a judge sitting at the bench. He thought "maybe" someone was there.

It was the facts of Billy's physical frailty, stature, and blindness that impelled the state to invoke the presumption of conduct creating a high probability of great bodily harm when the assault is upon one with a physical disability.[5] Additionally, the state also sought to prove, by what it called direct evidence, that the consequences of blows inflicted by Crowley demonstrated that they were the result of conduct that created a high probability of great bodily harm.

A failure to prove a crime by sufficient evidence is fatally defective because the defendant convicted on such evidence is denied due process of law. *Jackson v. Virginia,* 443 U.S. 307 (1979).

In the instant case the state utilized two disparate modes of proof—direct and presumptive. It is unclear which mode of proof, either of which may have been accepted by the jury, was actually employed. Thus, there is a logical possibility, to an undeterminable degree of likelihood, that the jury finding of guilt may

---

[5]At trial, defendant objected to the presumption on the grounds that it was mandatory, shifted the burden of proof, and hence was violative of *Sandstrom v. Montana,* 442 U.S. 510 (1979). That claim has been abandoned in this court. It is clear from the face of the statute that the presumption is permissive and is rebuttable. *See,* sec. 940.19(3)(b), Stats.

have been predicated on a mode of proof which did not produce evidence of guilt beyond a reasonable doubt, even though one of the modes of proof was supported by sufficient evidence. The problem is that an appellate court cannot be sure that it was that mode of proof which was used by the jury. A conviction under such circumstances violates constitutional due process.

There are cases in Wisconsin which, at first uncritical examination, arguably lead to the opposite conclusion—*i.e.,* as the court of appeals concluded, that if there is sufficient evidence under one mode and if the jury could have utilized that mode of proof, the evidence is sufficient. The court of appeals so asserted without any citation of authority. Superficially, *Holland v. State,* 91 Wis. 2d 134, 280 N.W.2d 288 (1979), *State v. Giwosky,* 109 Wis. 2d 446, 326 N.W.2d 232 (1982), and *State v. D'Acquisto,* 124 Wis. 2d 758, 370 N.W.2d 781 (1985), appear to have some relevance to the instant case. We conclude they do not.

It should be remembered the question on this review is whether the evidence believed by the jury was sufficient to convict in a criminal case when the evidence which the jury could consider was different evidence, subject to proof by different methods. On direct proof, the evidence sought to be established was by direct testimony in respect to the nature of the intentional conduct which caused the injury. Under that method of proof, whether or not Billy was physically disabled was irrelevant.

Under the other mode of proof, under the statutory presumption as predicated in 3(b), whether or not Billy was physically disabled is controlling and, if he was, that in itself was presumptive proof that the

conduct created a high probability of great bodily harm.

*Holland* was concerned not with evidence or its sufficiency, but with whether the jury had to agree unanimously on one of several disjunctive theories of criminal participation. There was sufficient evidence to sustain a conviction on each of the several methods of participating in the crime, *i.e.,* directly committing, aiding or abetting, or by conspiracy. In *Holland,* the gravamen element of proof was "participation" in the crime. No question was raised in respect to sufficiency of that proof, irrespective of the theory of participation. The jury was unanimous in respect to the sufficiency of evidence of participation in the crime of second degree murder. *Holland* was correctly decided, but it is beside the point in respect to the present case.

Jury unanimity in the determination of the mode of committing a single crime is not required. That is what *State v. Giwosky,* 109 Wis. 2d 466, 326 N.W.2d 232 (1982), and *State v. D'Acquisto,* 124 Wis. 2d 758, 370 N.W.2d 781 (1985), were about. That is not the concern in the present case. In those cases, the court was confronted with arguments that the defendant was denied the right to a unanimous jury, because battery was alleged to have been committed in one of two different ways, when the jury had not explicitly stated the manner in which it found the battery to have been committed. We rejected the arguments in both cases, for, in *Giwosky,* the battery with fists and beating with a log were all parts of a continuing battery. The failure of the jury to state what instrument was used was irrelevant. It should be noted that the evidence in respect to the use of fists or of a log was each independently sufficient. The same rationale

in *D'Acquisto* was used to point out the irrelevancy of asking the jury to decide whether the battery was the striking of the victim with a radio or pounding the victim's head into the ground. The method of assault was conceptually similar.

These three cases are, however, different from the instant case. In none of those cases was the sufficiency of the evidence at issue. They are not like this case, where there is a dichotomy in the mode or methodology of proof and the assertion is that on at least one methodology the jury might have relied on proof that was insufficient. In the instant case, the problem is not as stated by the state in its brief—that these are merely alternative bases of culpability. The basis of culpability is not in the alternative. In each the same proof—the nature of the conduct—must be adduced beyond a reasonable doubt. The alternative is the mode of proving the conduct which created a high probability of great bodily harm. It is certainly conceivable that the jury could have relied on a mode of proof that failed to produce evidence of guilt beyond a reasonable doubt. Hence, both modes of proof must be examined as to sufficiency—a constitutional due process question—a question not raised in *Holland, Giwosky,* and *D'Acquisto.*

In a case such as the one before the court, where the jury may have arrived at its verdict by one of two independent grounds and there is no certainty in respect to which ground is used, a court is obliged to search the record in an effort to support the verdict of conviction and to determine that the evidence is sufficient under each mode of proof.

The United States Court of Appeals in *United States v. Sales,* 725 F.2d 458, 459 (1984), capsulized the rule, stating, "[T]he rule ... 'requires a verdict to be

set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected.'" *Yates v. United States,* 354 U.S. 298 (1957); *Zant v. Stephens,* 462 U.S. 862 (1983); *Stromberg v. California,* 283 U.S. 359 (1931).

Nevertheless, this rule does not affect the ultimate question of Crowley's guilt. While in this case we cannot tell which mode of proof the jury selected—"direct" evidence or that based upon the statutory presumption—we do not invoke the rule to require reversal, for we conclude that the evidence is sufficient under both modes of proof. The verdict must be upheld and the court of appeals decision affirmed.

We utilize the following methodology for the analysis of the problem in this case. We first examine the record to determine whether the jury could have relied upon an alternative mode of proof. Only if it could have, should we then proceed to review the evidence to determine whether the evidence is sufficient under each alternative method or mode of proof. *Cf. State v. Gustafson,* 119 Wis. 2d 676, 351 N.W.2d 653 (1984), *on rehearing* 121 Wis. 2d 459, 359 N.W.2d 920 (1985).

Under the facts of this case, where the verdict was a general one, obviously the jury could have relied on either method. We therefore are obliged to examine the proof supporting each method by which the jury could have concluded that Crowley's conduct created a high probability of great bodily harm.

■

We initially look to the sufficiency of the proof under the direct method, *i.e.,* the evidentiary process, that did not invoke the presumption predicated on the assumption that Billy Zinkle was "physically dis-

abled." The court of appeals held that, under the direct method, the proof was sufficient. We agree. We believe, however, that the cursory rationalization employed by the court of appeals and now basically urged by the state is insufficiently explained. The court of appeals and the state both look to the testimony of Billy Zinkle's physician that, because the injuries sustained created a high probability of death, they were *ipso facto* the result of conduct which created a high probability of great bodily harm. This rationale is obviously flawed. Death-threatening or death-causing injuries can, and frequently do, result from negligence, personal inadvertence, or accident.[6] It is evident that the mere fact of a life-threatening injury is not proof of the nature of the antecedent conduct. Whether or not the resultant injuries were "life threatening" taken alone is irrelevant to proof of the antecedent conduct.

The fact that the defense failed to refute the serious nature of Billy's injuries is inconsequential. The only necessary element of the crime in respect to injuries under sec. 940.19(3)(b), Stats., is that there be "bodily harm." This is a fact conceded. Additionally, unlike *Seidler,* in this case intent to cause bodily harm is not in controversy at this juncture. It is clear that Crowley intended to cause bodily harm. Thus, the fact situation here is analogous to *Turner v. State,* 76 Wis. 2d 1, 250 N.W.2d 706 (1977), where sodomization and death of a child resulted in a conviction of second degree murder, which was affirmed by this court. However, we sustained the element of "imminently dangerous" not on the fact of death alone, but upon

---

[6]*See, Seidler v. State,* 64 Wis. 2d 456, 219 N.W.2d 320 (1974), where tossing a child onto a bed caused fatal injuries. There, however, there was no proof of any intent to cause bodily harm.

the fact that the conduct was intentional, not inadvertent, and was causal, without the intervention of any other factors. Thus, in such a circumstance, the nature of the conduct can be inferred from the result and from attendant facts that circumstantially prove the nature of the conduct, but not from resultant injuries alone. A similar rationale was utilized in *State v. Flakes,* 140 Wis. 2d 411, 410 N.W.2d 614 (Ct. App. 1987), where the evidence of the victim's injuries—strangulation—was used as a factor in determining the dangerousness of the defendant's conduct.

Accordingly, we think it well established that, where the defendant's acts are the sole factor in causing the injury, and they are intentional, the nature of the injuries is a factor that a court may allow a jury to consider in ascertaining the nature of the conduct. It should be emphasized that this rationale does not apply where there is evidence to support a defense of misadventure. In the instant case, that defense was completely absent. Here there was no misadventure; there was proved criminal intent to inflict bodily harm. From the injuries in this case there therefore arises an evidentiary showing that Crowley's conduct in furtherance of his intent to cause bodily harm was conduct that created a high probability of great bodily harm. This, however, is not the rationale of the court of appeals. That court assumed that, because the injuries were life threatening, that fact in itself was proof that Crowley's conduct created a high probability of great bodily harm. That court failed to consider the possibility of intervening factors or misadventure and was therefore incorrect.

■

There was other direct undisputed evidence that was highly probative of the felonious nature of Crowley's conduct and there were additional and significant factors on which the jury could base its findings that the conduct created a high probability of great bodily harm: Crowley's size, strength, and state of health; Billy's diminuitive size and state of health; the fact that Crowley intended to hit the small victim in the vicinity of the eyes and to hit him hard (as the glasses were being removed, Crowley said, "I don't want to break another pair"); and the fact the blows were to the head, the nerve center of the body. It should be observed that these factors do not pertain to Billy's "disability." These factors are directly probative of the fact that Crowley's intentional conduct created a high probability of great bodily harm regardless of any disability Billy might suffer. Even were the jury to have ignored the nature of Billy's actual injuries and the medical opinion that the injuries were life threatening, the evidence was sufficient to allow the jury to find beyond a reasonable doubt that Crowley's intentional conduct in striking Billy hard and repeatedly in the head was conduct creating a high probability of great bodily harm.[7]

The prosecution also sought to rely on the presumption set forth in sec. 940.19(3), Stats. The jury was instructed pursuant to Wis. JI—Criminal 1228.[8]

---

[7]Had the prosecution elected to rely on direct evidence, and not at all on the presumption afforded by "physical disability," the sufficiency of the evidence beyond a reasonable doubt would be unquestioned.

[8]"The fourth element of this offense requires that the defendant's conduct created a high probability of great bodily harm. Under the Criminal Code, great bodily harm '... means

While the reliance on the *Sandstrom v. Montana* objection has been abandoned, counsel on this appeal jumps to a new approach based on *Ulster County Court v. Allen,* 442 U.S. 140 (1979), that a presumption may be impermissible if there is no reasonable nexus or relationship between the evidentiary facts and the fact to be presumed. Here the evidentiary fact (which, of course, must be established) is that Billy was "physically disabled," and that if such were the case, it is reasonable to presume that a battery upon such a person which causes harm was likely to be conduct that created a high probability of great bodily harm. In other words, we conclude that the relationship, the nexus, between physical disability and the likelihood that violence against one physically disabled will lead to great bodily harm, is unassailable, particularly in the instant case, where the evidentiary facts are largely undisputed. There is a clear relationship between an assault which is intended to cause bodily harm and the presumption that such an assault on a discernibly physically disabled person is conduct which creates a high probability of great bodily harm.

It appears that, for some inexplicable reason, defense counsel on this review accepts the nexus posed

bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious injury.'

"If you find that the victim had a physical disability at the time of the offense and that such disability was discernible by an ordinary person viewing the victim, you may find from that fact alone that the defendant's conduct created a high probability of great bodily harm. But you are not required to do so, and you must be satisfied beyond a reasonable doubt from all the evidence that the defendant's conduct created a high probability of great bodily harm."

by sec. 940.19(3)(a), Stats., relating to "a person ... 62 years of age or older." Without any proof whatsoever, counsel in his brief gives notice of his own stereotyped perception of the infirmities of age. He makes it clear that, therefore, there is an appropriate nexus between the fact of age and the presumption that violence against the aged will create a high probability of great bodily harm. Interestingly, he puts this in relative terms—"more brittle bones," "a weaker heart," "lesser recuperative powers." Thus, he accepts a classification that compares a group of persons relative to other persons in our society.

It would appear that the same acceptance should apply equally to persons relatively disadvantaged by being "physically disabled." The physically disabled share with the aged the traits of being relatively weaker than other persons in our society and, therefore, ought to be accorded the same protections counsel would willingly extend to the aged.

Moreover, the incongruity of counsel's unprotesting acceptance of the presumption for those over sixty-two is demonstrated, because it is clear the fact of age of the victim has no relationship to the actual or objective nature of the "conduct" of the assailant. In respect to each classification (age or physical disability), the legislative assumption simply appears to be the protection of a physically disadvantaged group from the bullying of others not disadvantaged.[9]

[9]Were an eighty-year-old person to intentionally cause bodily harm to a sixty-two-year-old person, would the statute on its face trigger the presumption that the conduct of the eighty-year-old was such that it created a high probability of great bodily harm? It would appear, following the rationale of defense counsel adopted from *Ulster,* that an evidentiary nexus would need to exist. Hence,

Given that the physical disability presumption has a sufficient nexus to the evidentiary facts sought to be proved, the next question is whether Billy Zinkle has a "physical disability ... which is discernible by an ordinary person," as required by the terms of the statutory presumption. It appears that, under the statutory test, there is a requirement that there be evidence, beyond a reasonable doubt, from which a jury could conclude that Billy was "physically disabled."

We conclude that such evidence was produced, and, under the appropriate standards, a reasonable jury, in light of the evidence, could—and in this case did—find Billy to be disabled.

"Physical disability," as used in this statute, is not a word of art. That condition may arise from multiple causes: Congenital, accidental, injury, or disease (sec. 940.19(3)(b), Stats.). Because the statutory test is what is "discernible" to an ordinary person, it is highly likely that the legislature contemplated a temporary disability as well as a permanent one. There is no intimation that this term, "physical disability," is to be viewed technically. The term is a broad one. Originally, the legislative drafts referred to impairments that centered on mobility.[10] The present wording is clearly broader. Would a jury conclude that

the age presumption, despite the stereotyping indulged in by counsel, is equally subject to the nexus test.

[10]This bill originally appeared as Senate Substitute Amendment to 1979 Assembly Bill 8. That provision read in relevant part:

"A rebuttable presumption of conduct creating a high probability of great bodily harm arises ... if the person harmed requires an assistive device for mobility, including, but not limited to, a wheelchair, brace, crutch or artificial limb."

the type of deviation from a normal physical condition be discerned by an ordinary person as a physical disability. Thus, the medical testimony, which was admitted, of Billy's physician that Billy was disabled misses the mark. Disability need not be found as a medical fact, but only as a matter discernibly evident to a non-expert, a lay person. The physician's testimony was surplusage, and defendant's arguments that it is incorrect are therefore irrelevant.

Billy's conditions discernible to an ordinary person were his unusual shortness and his wearing of glasses that signalled extremely poor vision in the absence of correction. The question is whether from these readily discernible facts a reasonable jury could conclude that Billy was physically disabled. We conclude, in light of the fact that we are analyzing a battery statute, where the clear import of the legislative intent is to penalize bullies who prey on weaker persons, that under the facts of this case Billy was "physically disabled" and a jury could so find.

We need not conclude, nor did the jury need under the circumstances to conclude, that Billy was physically disabled for all purposes. Clearly, he was not necessarily a handicapped person as that term is used in the Fair Employment laws. Secs. 111.31 to 111.395, Stats. We have recognized that neither small height nor diminished visual acuity are *ipso facto* indices of "handicap." This is not dispositive, however, because, contrary to the assertions of the court of appeals dissent and counsel for Crowley on this review, this case is not ruled by our prior Fair Employment decisions. The policy of the Fair Employment Act is to:

"... protect by law the rights of all individuals to obtain gainful employment and to enjoy privileges free from employment discrimination because of ... handicap ... [and] to encourage and foster to the fullest extent practicable the employment of all properly qualified individuals regardless of ... handicap ...." Sec. 111.31(2) and (3), Stats.

The Fair Employment standard, as we explained in *American Motors Corp. v. LIRC,* 119 Wis. 2d 706, 714, 350 N.W.2d 120 (1984), pointed out that a woman's small size did not amount to a "physical *disability* or *impairment* that a person has in addition to his or her normal limitations that makes achievement not merely difficult, but *unusually* difficult, or that limits the capacity to work."

Thus, the Fair Employment Act is related to qualifications in the workplace. It is entirely irrelevant to the protection of those persons who are presumptively entitled to special concern in respect to criminal assaults. Under the Fair Employment Act, it would be contrary to the intention of the legislature to define "handicap" so broadly as to force an employer to hire a person who could not do the work at all—*i.e.,* one who was not qualified for the task at hand. By contrast, it does not appear to be contrary to the legislative intent to employ a broad legal presumption to find felonious conduct and thus to penalize those who prey on the weak. It is therefore appropriate to accept a broad (what is discernible to an ordinary person) meaning to "physical disability" in the context of sec. 940.19(3)(b), Stats.—the battery statute.

Despite the court of appeals dissent and Crowley's arguments, the Fair Employment cases simply miss the mark in the present context. Because we do not in

this case purport to revisit our handicap cases under the Fair Employment Act, we do not wish to obscure their separate purpose by either contrasting the fact situation posed in the Fair Employment cases or by pointing out their possible congruence of "handicaps" when applied in the context of the battery statute. We note in passing, however, that for "physical disability" under sec. 940.19, Stats., the disability must be "discernible" to an ordinary person. Contrast this with the holdings in *Dairy Equipment Co. v. ILHR Dept.*, 95 Wis. 2d 319, 290 N.W.2d 330 (1980), where it was held a person with only one kidney was considered to be "handicapped," and *Chicago, Milwaukee, St. Paul & Pacific RR. Co. v. ILHR Dept.*, 62 Wis. 2d 392, 215 N.W.2d 443 (1974), where an asthmatic person was held to be handicapped. Neither of these conditions would appear to be of the type discernible to an ordinary person. It is beyond doubt that the two lines of cases are concerned with completely different social concerns and the tests for deciding each are legislatively different. The use of the handicap cases in the present case is inappropriate.

We think it beyond peradventure that, given the purpose of sec. 940.19(3), Stats. (the special protection that certain classes of people are to be afforded by special statutory provisions), a person with the physical attributes of Billy Zinkle could, beyond a reasonable doubt, be found by a reasonable jury to have a "physical disability" as contemplated in the statute.

The appropriate standard of review is that a "'jury verdict will be overturned only if, viewing the evidence most favorably to the state and the conviction, it is inherently or patently incredible, or so lacking in probative value that no jury could have found guilt beyond a reasonable doubt.'" *State v.*

*Serebin,* 119 Wis. 2d 837, 842, 350 N.W.2d 65 (1984), citing *Fells v. State,* 65 Wis. 2d 525, 529, 223 N.W.2d 507 (1974).

Using this appropriate standard of review, it is beyond doubt that there was sufficient evidence produced by the state—directly by showing the nature of Crowley's intentional conduct and the attendant circumstances, and indirectly by use of the presumption to prove beyond a reasonable doubt that Crowley intentionally caused bodily harm to Billy Zinkle by conduct which created a high probability of great bodily harm.

Accordingly, we conclude, after examining both methods of evidentiary proof, either of which may have been used by the jury, that there was sufficient evidence under each to sustain the jury's finding of guilt. We affirm the decision of the court of appeals.

Turning to the last issue presented by this case, we are in agreement with the decision of the court of appeals, and we too conclude that the circuit judge did not abuse his discretion when he failed to respond to a note from one of the jurors during the course of trial.

The juror sent a note to Judge Kirchman stating, "I think we have been given a problem that we are not able to comprehend as we are not doctors of anything and in my own conscience I cannot convict a person on this evidence." In fact, the juror did, for the verdict was a unanimous finding of guilt. We accept the statement of the court of appeals, unanimously agreed upon, as our own:

"The juror's communication was a statement, not a question, and neither Crowley nor the state

has offered any authority for the proposition that a trial judge must respond to a juror's statements or comments. We note that the cases cited by Crowley, *Commonwealth v. Smith,* 70 A. 850 (Pa. 1908). *Reilly v. Poach,* 323 A.2d 50 (Pa. 1974), and *State v. Morrissy,* 25 Wis. 2d 638, 131 N.W.2d 366 (1964), involved juror *questions* directed to the court.

"A unanimous jury found Crowley guilty, and he did not elect to poll the jury to discover whether any juror was in doubt as to his or her verdict. We assume it would be a rare juror who did not have some initial doubts or reservations about a verdict. Indeed, twelve jurors may well have twelve different opinions at the outset, and the fact that one juror expresses uncertainty to other jurors, or even to the judge, is of no consequence. The deliberative process is itself a means of resolving those doubts and achieving unanimity through an exchange of views. We decline Crowley's unsupported request that we find error in Judge Kirchman's failure to respond to a juror's innocuous statement with one of his own."

*By the Court.*—Decision affirmed.