State of Wisconsin, Plaintiff-Respondent,
v.
Arnold R. Warrichaiet, Defendant-Appellant.
State of Wisconsin, Plaintiff-Respondent,
v.
Francis D. Warrichaiet, Defendant-Appellant.
Nos. 04-0669-CR, 04-0670-CR
Court of Appeals of Wisconsin.
Opinion Filed: March 1, 2005.
Before Cane, C.J., Hoover, P.J., and Peterson, J.
¶ 1 HOOVER, P.J.
Francis Warrichaiet appeals a judgment of conviction, entered upon a jury's verdict, for obstructing a warden and disorderly conduct, as well as an order denying his motion for postconviction relief. We agree with Francis' essential argument that there was insufficient evidence on which to convict him of either charge and therefore reverse the judgment and order in appeal No. 04-0670-CR. Arnold Warrichaiet appeals a judgment of conviction, entered upon a jury's verdict, for assault on a law enforcement officer and disorderly conduct, as well as an order denying his motion for postconviction relief. We reject Arnold's sufficiency-of-the-evidence argument related to his charges and we affirm the judgment and order in appeal No. 04-0669-CR.[1]

Background
¶ 2 On Thanksgiving Day 2001, a number of people had gathered at Francis' home, initially congregating near their vehicles parked on the road. Department of Natural Resources Wardens Frederick Peters and Michael Kitt had driven past and noted the group. The wardens parked and approached the group, inquiring how hunting was going. The wardens then specifically asked whether anyone had shot a deer, and several group members stated that no one had. The crowd gradually drifted closer to the residence, while Peters began walking along the road and looking into the parked vehicles for weapons in plain sight.
¶ 3 Peters then observed a deer carcass hanging in an open storage shed farther back on the property. He asked the group whose it was, but no one claimed ownership. Peters testified he was concerned that the deer might not be properly registered and decided to inspect the carcass. Members of the group initially demanded a search warrant, which Peters denied he needed. The group would not relent, so Peters went to his vehicle and called for assistance.
¶ 4 When Peters returned from his vehicle, Francis' grandson Phillip said he had shot the deer and then offered his license, carcass tag, and registration tag. Peters nonetheless insisted upon inspecting the carcass and asked someone to accompany him from the residence to the shed. At that point, Arnold, Francis, and other family members stepped in front of Peters to block his progress.
¶ 5 Arnold contends that Peters grabbed him by the shoulder to push him aside. Arnold raised his hands without touching Peters, who allegedly grabbed Arnold and dragged him across the lawn to arrest him for obstruction. Peters testified that Arnold first made a gesture as if he were going to push Peters, who then grabbed Arnold by the shoulder to deflect him and move him out of the way. Arnold then apparently attempted to break away from Peters' grasp, prompting the warden to reach for his pepper spray. Arnold punched Peters below the left eye.
¶ 6 By this point, other officers and wardens had arrived on the scene, including Peters' supervisor, Warden Robert Goerlinger. Goerlinger began photographing the area, ostensibly to document the assault on Peters. However, he also began photographing the shed, some forty-five yards away from the area of the assault. Francis demanded a warrant and, when that was not produced, he slapped at Goerlinger and his camera. Goerlinger ceased his investigation to prevent further confrontations or injury to the wardens.
¶ 7 Ultimately, Francis was charged with resisting Warden Kitt, obstructing Warden Goerlinger, obstructing Warden Peters, and disorderly conduct. Arnold was charged with assault on a law enforcement officer, resisting arrest, obstructing an officer, and disorderly conduct.[2] The cases were joined for trial. The court dismissed Arnold's obstruction charge and the jury acquitted him on the resisting charge, but he was convicted of assault and disorderly conduct. Francis was convicted of obstructing Goerlinger and disorderly conduct but acquitted on the other two charges. The Warrichaiets filed postconviction motions challenging the sufficiency of the evidence, but the court denied them. The Warrichaiets appeal. Additional facts will be mentioned as necessary.

Discussion

Francis' Obstruction Charge
¶ 8 Because we resolve each appeal differently, we will discuss them separately, beginning with Francis' case. Francis was charged with obstructing Warden Goerlinger, contrary to WIS. STAT. § 29.951, for knocking the camera and causing Goerlinger to halt his investigation into Peters' assault.[3] Francis contends there is no evidence Goerlinger was "acting with lawful authority"an element, as the jury was instructedso there is insufficient evidence to convict him.
¶ 9 When reviewing sufficiency of the evidence to support a conviction, we must uphold the conviction "unless the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt."[4]State v. Poellinger, 153 Wis. 2d 493, 501, 451 N.W.2d 752 (1990). If it is a possibility the jury "could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt," we must uphold the verdict. Id. at 507.
¶ 10 The jury instruction for the obstructing a warden charge was adapted from the obstructing an officer instruction, WIS JICRIMINAL 1766 (2003), and neither party objected to the adaptation. As instructed the third element of this charge "requires that the warden was acting with lawful authority. Conservation wardens act with lawful authority if their acts are conducted in accordance with the law. In this case, it is alleged that the warden was enforcing hunting laws." (Emphasis added.) Francis contends there is no evidence that Goerlinger was enforcing the hunting laws. We agree.
¶ 11 By Goerlinger's own testimony, he was taking photographs to document the assault on Peters. But Francis became confrontational only when Goerlinger began photographing the shed. The State argues that Goerlinger's photography is an extension of Peters' initial attempts to verify and enforce the tagging requirements because Goerlinger was photographing the suspicious deer that triggered the entire situation. We reject this contention. The State is essentially asking us to connect subsequent events back to an initial hunting investigation, no matter how tenuously connected.
¶ 12 The State contends that even if Goerlinger was not enforcing hunting laws, he had lawful authority to photograph the crime scenethat is, the location of the assault. Assuming Goerlinger has the authority to investigate an offense of the criminal statutes, the shed and deer were approximately forty-five yards from the location of the assault. We therefore are unconvinced that the shed was part of the crime scene.
¶ 13 Finally, the State contends that Goerlinger and the wardens "arguably" did not need a warrant to inspect the carcass or shed, having statutory authority "under WIS. STAT. § § 29.347(2), 29.924(4) and/or 29.931." The State never develops this argument. Moreover, we disagree with the State's reading of these statutes.
¶ 14 WISCONSIN STAT. § 29.347(2) simply requires a deer to be immediately tagged and remain tagged until the carcass is registered. Under WIS. STAT. § 29.924(4), "[t]he owner ... of any ... building used for the storage or retention of wild animals, or their carcasses, that are subject to regulation under this chapter shall permit ... [DNR] wardens to enter and examine the premises subject to s. 66.0119." However, WIS. STAT. § 66.0119(2) requires wardens to obtain a special inspection warrant, which none of the wardens had.
¶ 15 Finally, while WIS. STAT . § 29.931 allows a warden "with or without [a] warrant" to inspect a building where the warden believes an animal carcass may be held in violation of WIS. STAT. ch. 29, the warden must have probable cause to believe a violation has occurred. The carcass, by itself, does not automatically suggest a violation of hunting regulations in the same way that, as the State analogizes, marijuana plants in plain view suggest a violation of the criminal code or local ordinances. Moreover, the State fails to adequately develop an argument based on § 29.931 that would convince us there was otherwise probable cause to suspect a violation. See State v. Pettit, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992).
¶ 16 We therefore conclude there is insufficient evidence from which a jury could conclude Goerlinger was in the process of enforcing hunting laws or otherwise acting with a lawful purpose when Francis tried to stop his photography. Because a lawful purpose by the warden was included as an element of the charge, Francis' conviction for obstructing a warden is reversed.

Francis' Disorderly Conduct Charge
¶ 17 Under WIS. STAT. § 947.01, "[w]hoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor." Disorderly conduct may be conduct, or speechnot all speech is constitutionally protected or both. Francis contends, however, that the charge was based strictly on his verbal confrontation and that this argument was protected speech.
¶ 18 Francis engaged in an argument with Peters and Kitt regarding the necessity of a warrant, then yelled and swore at Peters when he was struggling with Arnold. At trial, the State conceded that the speech at issue was in fact protected under the First Amendment.
¶ 19 But Francis had also blocked Peters' path to the shed. Thus, the State argues, "Francis engaged in abusive conduct which tended to provoke a disturbance by physically interfering with Wardens Peters and Kitt, thereby disrupting their efforts to investigate a possible hunting law violation. This tended to provoke a disturbance among others present."
¶ 20 The problem, however, is that the criminal complaint alleged only the verbal confrontation as the basis for the disorderly conduct charge. At trial, the State proceeded to argue that Francis' actions, not speech, were disorderly. But the jury was then instructed that the alleged speech formed the factual basis for the charge, and that disorderly conduct can be speech or action or both. Thus, we are presented with a question not of an erroneous jury instructionthe instruction was technically a correct statement of the law of disorderly conduct but a question whether the instruction misled the jury.
¶ 21 "[T]he proper standard for Wisconsin courts to apply when a defendant contends that the interplay of legally correct instructions impermissibly misled the jury is whether there is a reasonable likelihood that the jury applied the challenged instructions in a manner that violates the constitution." State v. Lohmeier, 205 Wis. 2d 183, 193, 556 N.W.2d 90 (1996).
¶ 22 Here, although the jury instructions identified disorderly conduct as actions or speech, the jury was instructed that Francis' speechnot his actions were the basis for the charge in this case. The State at trial, however, conceded the speech was protected. It therefore cannot form the factual basis underlying the conviction.
¶ 23 The State attempted reformation of the charge when it suggested in closing argument that Francis' actions were disorderly, and it appears the jury accepted the reformation. Convicting Francis based on his actions rather than his speech, however, amounts to a due process violation by convicting him of an uncharged offense. See Mathews v. Eldridge, 424 U.S. 319, 348 (1976). The State could have amended the complaint to allege the facts of Francis' actions, or it could have objected to the part of the jury instructions stating that Francis' argument was the basis for the charge, but it did neither. Francis' conviction for disorderly conduct is reversed.

Arnold's Appeal Extraneous Information
¶ 24 In considering the case against Arnold, we begin with a discussion of extraneous information in the jury room.[5] Arnold complains that one of the jurors mentioned during deliberations that he had heard Arnold had been in a bar fight. This, Arnold contends, impermissibly influenced the jury because it is, essentially, a species of inadmissible other acts or character evidence.
¶ 25 Initially, the party seeking to impeach a jury verdict based on extraneous information must demonstrate that juror testimony about the information is admissible under WIS. STAT . § 906.06(2)[6] by establishing: (1) the juror's testimony concerns the extraneous information and not the deliberative process of the jury; (2) the extraneous information was improperly brought to the jury's attention; and (3) the extraneous information was potentially prejudicial. See State v. Eison, 194 Wis. 2d 160, 172, 533 N.W.2d 738 (1995). The State has conceded Arnold fulfills this portion of the test.
¶ 26 Once it is determined that the challenging party has satisfied the WIS. STAT . § 906.06(2) requirements, the circuit court determines whether one or more jurors engaged in the alleged conduct and whether the error was actually prejudicial. Eison, 194 Wis. 2d at 172-73. This second step presents a mixed question of fact and law. Whether a juror engaged in the conducthere, bringing in extraneous informationis a factual question, but whether there was actual prejudice is a question of law that we review de novo. Id. at 177. The State must show, beyond a reasonable doubt, that the extraneous information did not contribute to the verdict. Id. at 178.
¶ 27 The circuit court determined:
The nature of the extraneous information ... is in the form of character evidence, i.e. other bad acts. Claims that Mr. Arnold Warrichaiet ... was involved in bar fights all relate to his character. This is not the type of case, however, that had anything to do with a bar fight. The information received was received without any supporting specifics whatsoever. Clearly, it was in the nature of "gossip" rather than true factual allegations to be relied upon by any jurors. This information had little, if any, indication of trustworthiness. Therefore ... [the information] would not have had a prejudicial effect upon a hypothetical average juror.
¶ 28 We disagree with the court's statement that since the instant case did not involve a bar fight the extraneous information is unimportant. This case involves a question of Arnold's propensity for aggression, as would allegations of provoking a bar fight. However, we agree with the court's ultimate conclusion that the information had little indication of reliability and would be unlikely to influence the average juror.
¶ 29 Four jurors testified, and a review of their testimony bears out the trial court's conclusion. One juror denied that any extraneous information was discussed by the jury at all. Two jurors stated that a younger male juror had brought up the alleged bar fight, but the fourth juror could not remember who had mentioned it. The juror with the information either heard Arnold had been in a fight, heard about it but might not have seen it, or actually observed it. One juror stated that the reporting juror might only have said that Arnold had engaged in misconductnot a fight.
¶ 30 The juror with the information might have addressed the whole jury, or might have addressed no one in particular. One juror said that the reporting juror mentioned Arnold's brother also being involved in the fight; one said the reporting juror made no mention of others. Two jurors said that there was no mention of an arrest; the third was not asked. One juror testified the alleged information was discussed with the whole jury, one said it was only discussed a little, and the t hird said there was no discussion at all.
¶ 31 Ultimately, Arnold has not established what was said or to whom. However, the record establishes that the trial court believed whatever discussion the jurors had was not a material component of the jury's deliberations. Indeed, the great variety and conflict of the recollections supports the trial court's characterization of the information as unreliable gossip and the notion that an average juror would view it as such.
¶ 32 We presume the jury follows the trial court's instructions. State v. Adams, 221 Wis. 2d 1, 12, 584 N.W.2d 695 (Ct. App. 1998). The jury was instructed that anything seen or heard outside the courtroom was not evidence to be considered. We are satisfied that the jury would apply this standard to gossip and are therefore convinced there was no prejudice from the extraneous information.

Arnold's Assault Conviction
¶ 33 Arnold was charged with assaulting Peters, contrary to WIS. STAT. § 940.20(2).[7] Arnold claims that there is insufficient evidence to convict him because he acted in self-defense under WIS. STAT. § 939.48, an affirmative defense the State failed to disprove. He argues that his self-defense was justified by Peters' "unlawful assault" of grabbing his shoulder to move him as well as the subsequent events.
¶ 34 As noted above, when we review the sufficiency of the evidence, we must uphold the conviction "unless the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." Poellinger, 153 Wis. 2d at 501. If it is a possibility that the jury "could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt," we must uphold the verdict even if we believe that the jury "should not have found guilt based on the evidence before it." Id. at 507. When a defendant successfully raises an affirmative defense, the State must disprove the defense beyond a reasonable doubt. State v. Head, 2002 WI 99, ¶106, 255 Wis. 2d 194, 648 N.W.2d 413.
¶ 35 Under WIS. STAT. § 939.48(1), an actor "may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference" with his or her person. We conclude, however, that from the evidence presented, a reasonable jury could have found beyond a reasonable doubt that Arnold's actions were an unreasonable use of force.
¶ 36 The first hurdle to the affirmative defense is evidence that Arnold was the aggressor, not Peters. If the jury accepted the testimony that Arnold made a motion as though he were about to attack Peters, it would necessarily reject Arnold's self-defense argument. Even if the jury believed that Peters grabbed Arnold's shoulder first and concluded that Arnold reasonably tried to break away, the jury could have concluded the rest of his actions were unreasonable. There was evidence suggesting Arnold intentionally punched Peters in the face after breaking away from his grasp and before Peters could grab his pepper spray. The jury could have concluded that if Arnold was able to free himself from Peters' grasp, the reasonable response would have been to back away from the fight to de-escalate the situation, not to punch the warden. That is, the jury could have concluded Arnold overreacted, thereby exacerbating the situation and taking it from self-defense to assault.[8] We therefore reject the self-defense claim and affirm the assault conviction.

Arnold's Disorderly Conduct Charge
¶ 37 Arnold also challenges the sufficiency of the evidence for his disorderly conduct conviction, arguing that he was privileged to act in selfdefense, that he was provoked, and that the jury was misled when it was instructed that both his speech and actions could constitute disorderly conduct. We reject each of these arguments.
¶ 38 Arnold's sole argument regarding self-defense on the disorderly conduct charge is that because he proved self-defense on the assault, it applies to this charge as well. However, we have rejected self-defense for the assault and accordingly reject it for the disorderly conduct charge.
¶ 39 Arnold argues that he was provoked into disorderly conduct by the wardens, and that this provocation is prohibited under Lane v. Collins, 29 Wis. 2d 66, 73, 138 N.W.2d 264 (1965). We conclude, however, that Lane does not apply to these facts.
¶ 40 Lane was a civil action brought against police officer Collins for the tort of false imprisonment. Collins stopped Lane's vehicle, ostensibly for a broken taillight. After the stop, Collins never mentioned the traffic violation but instead told Lane to stop calling the officer's home. Lane was calling Collins to tell him to stop associating with Lane's ex-wife. During the stop, Lane's ex-wife arrived on the scene and spoke briefly with Collins. When Collins returned, he asked whether Lane was on probation. Lane cursed at Collins, who then arrested Lane for his profane speech.
¶ 41 The trial court had granted Collins' motion for a directed verdict, but the supreme court reversed, stating "a police officer cannot provoke a person into a breach of the peace, such as directing abusive language to the police officer, and then arrest him without a warrant." Id. at 72. This is the language on which Arnold relies.
¶ 42 Typically, however, a provocation defense arises when an officer has engaged in name calling or other offensive conduct that would tend to provoke retaliatory conduct of the same nature. See id. at 73. In this case, Arnold contends that he was provoked by the unlawful search.[9]
¶ 43 Officers and wardens are routinely called upon to investigate suspicious circumstances. Sometimes they have warrants and sometimes they do not. Of those warrantless searches, some will fall under an exception and will be held permissible and constitutional and others will be deemed a violation of someone's rights. The ultimate determination of legality, however, is a function committed to the judiciary, not private citizens. The remedy for an unlawful search in a criminal case is suppression, not self-help. We therefore reject Arnold's notion that an unlawful search is provocation to disorderly conduct.
¶ 44 We find support for this notion in Lane as well. The Lane court quoted a Washington case as a basis for its ruling, noting:
We have said that, between himself and the public, the appellant [Lane] was guilty of such conduct as tended to breach the peace and probably justified his arrest, but in this action between himself and the officer arresting him, he had a right to show, if he could[,] that his conduct was brought about by the offensive conduct of the officer himself.
Id. at 73 (quoting Pavish v. Meyers, 225 P. 633, 635 (Wash. 1924) (emphasis added)). The case before us is one between Arnold and the public, not Arnold and any of the wardens. We therefore decline to consider provocation, as set forth in Lane, an affirmative defense in this case.
¶ 45 Arnold next complains the jury was confused by the disorderly conduct instruction, which stated that either speech or actions may form the basis for conviction. Arnold contends that his speech was protected and it is impossible to tell if the jury impermissibly convicted him on that ground. We disagree.
¶ 46 Generally, "[j]ury unanimity in the determination of the mode of committing a single crime is not required." State v. Crowley, 143 Wis. 2d 324, 333, 422 N.W.2d 847 (1988). However, "where the jury may have arrived at its verdict by one of two independent grounds and there is no certainty in respect to which ground is used, a court is obliged to search the record in an effort to support the verdict of conviction and to determine that the evidence is sufficient under each mode of proof." Id. at 334. This rule "requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." Id. at 334-35, quoting United States v. Sales, 725 F.2d 458, 459 (8th Cir. 1984).
¶ 47 One reason why it might be impossible to ascertain which ground the jury based its verdict on is if the jury instruction is confusing. "[T]he proper standard for Wisconsin courts to apply when a defendant contends that the interplay of legally correct instructions impermissibly misled the jury is whether there is a reasonable likelihood that the jury applied the challenged instructions in a manner that violates the constitution." Lohmeier, 205 Wis. 2d at 193.
Thus, Wisconsin courts should not reverse a conviction simply because the jury possibly could have been misled; rather, a new trial should be ordered only if there is a reasonable likelihood that the jury was misled and therefore applied potentially confusing instructions in an unconstitutional manner. Furthermore, in making this determination, appellate courts should view the jury instructions in light of the proceedings as a whole, instead of viewing a single instruction in artificial isolation.
Id. at 193-94.
¶ 48 Applying Crowley and Lohmeier, we conclude that, based on the entire record, we can ascertain which basis the jury used to convict Arnold. Moreover, we conclude the jury was not confused into misapplying the instruction so as to convict Arnold on an unconstitutional ground. It is evident the jury convicted him based on his actions, not his speech.
¶ 49 Unlike Francis' case, Arnold was charged with disorderly conduct based on both his scuffle with Peters and his argument with the wardens. However, the State presented evidence focusing on Arnold's conduct only and, in closing arguments, insisted that it was Arnold's behavior that tended to cause a disturbance. It did not emphasize Arnold's arguments. Given the focus of evidence presented to the jury, it would not have convicted Arnold based on his argument, the jury instruction notwithstanding. The State defined the issue in terms of Arnold's behavior only, properly focusing the jury.

Ineffective Assistance of Counsel
¶ 50 Arnold contends his trial attorney was ineffective for failing to introduce a provocation defense and for failing to request a jury instruction on a First Amendment defense to the disorderly conduct charge.[10] We disagree.
¶ 51 To support a claim of ineffective assistance of counsel, Arnold must show both that counsel's performance was deficient and that this deficiency was prejudicial. See State v. Reed, 2002 WI App 209, ¶14, 256 Wis. 2d 1019, 650 N.W.2d 885. We need not address both components if the defendant fails to make a sufficient showing on one of them. Id. To demonstrate prejudice, the defendant must affirmatively prove counsel's alleged defect had an actual, adverse effect on the defense. Id., ¶17.
¶ 52 Whether counsel was ineffective presents a mixed question of fact and law. Id., ¶ 16. The trial court's determination of what counsel did or did not do, along with counsel's basis for the challenged conduct, are factual matters we will not disturb unless clearly erroneous. Id. The ultimate conclusion whether counsel's conduct constitutes ineffective assistance is a question of law. Id.
¶ 53 We conclude Arnold demonstrates no prejudice. First, Arnold's counsel testified at the Machner[11] hearing that he did indeed introduce a provocation defense when he argued that the disturbance was provoked by the wardens, not Arnold. That the defense failed, or is rejected by us, does not make counsel ineffective. In addition, there is no prejudice from failure to request a First Amendment defense jury instruction because Arnold was not convicted based on protected speech.
By the Court.  Judgment and order in appeal No. 04-0669-CR affirmed; judgment and order in appeal No. 04-0670-CR reversed.
NOTES
[1] The Warrichaiets filed a motion to consolidate these appeals; we granted their motion on March 29, 2004.
[2] Other individuals at the scene were charged with offenses, although those cases were all evidently resolved prior to trial and are not an issue on this appeal.
[3] WISCONSIN STAT. § 29.951 states "Any person who assaults or otherwise resists or obstructs any warden in the performance of duty shall be subject to the penalty specified in s. 939.51(3)(a)." All references to the Wisconsin Statutes are to the 2001-02 version unless otherwise noted.
[4] We note that evidence most favorable to the State does not always mean the State's evidence.
[5] While Francis raised this argument as well, we reverse his convictions on other grounds.
[6] WISCONSIN STAT. § 906.06(2) states in relevant part:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations ... or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror....
[7] WISCONSIN STAT. § 940.20(2) states, in relevant part: "Whoever intentionally causes bodily harm to a law enforcement officer ... acting in an official capacity and the person knows or has reason to know that the victim is a law enforcement officer ... by an act done without the consent of the person so injured, is guilty of a Class H felony." Arnold does not dispute Peters' qualification as a law enforcement officer.
[8] The State directs us to State v. Hobson, 218 Wis. 2d 350, 370-80, 577 N.W.2d 825 (1998), where the supreme court abrogated the common law privilege of self-defense. There, the court concluded an individual has no right to physically resist an arrest, even if the individual believes the arrest is unlawful. The State argues we should extend Hobson to the case of unlawful searchesmeaning we could hold Arnold had no right to physically resist Peters here. However, we decline to so expand Hobson, as Arnold raised only statutory, not common law, privilege.
[9] To the extent Arnold contends he was provoked by Peters' assault on him, even assuming provocation is available as a defense to disorderly conduct, there is more than sufficient evidence from which a reasonable jury could conclude, beyond a reasonable doubt, that Arnold initiated the physical confrontation, negating the affirmative defense.
[10] Francis also raised an ineffective assistance of counsel argument, which we do not address because we reversed his case on other grounds.
[11] State v. Machner, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).