Brenda MURPHY and Bruce Murphy, Plaintiffs-
Appellants,†

v.

Dr. Bruce C. NORDHAGEN, D.C., National Chiropractic
Mutual Insurance Company, Defendants-
Respondents.

Court of Appeals

*No. 98–0564. Submitted on briefs August 7, 1998.—Decided
October 22, 1998.*

(Also reported in 588 N.W.2d 96.)

†Petition to review denied.

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Dana J. Wachs* and *Heidi L. Atkins* of *Jordan & Wachs* of Eau Claire, and *Dana J. Wachs, Heidi L. Atkins* and *John P. Richie* of *Misfeldt, Stark, Richie, Wickstrom & Wachs* of Eau Claire.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Bradway A. Liddle, Jr.,* and *Mark J. Steichen* of *Boardman, Suhr, Curry & Field* of Madison.

Before Dykman, P.J., Eich and Vergeront, JJ.

575

EICH, J.   Brenda Murphy appeals from a summary judgment dismissing her chiropractic malpractice action against Dr. Bruce Nordhagen, D.C.[1]

Murphy's complaint alleged that she sustained injuries as a result of Nordhagen's failure to (a) diagnose her herniated disc and refer her to a physician for treatment, and (b) obtain her informed consent to his own treatment of her condition. The trial court granted Nordhagen's motion for summary judgment dismissing the complaint, concluding that, under *Kerkman v. Hintz*, 142 Wis. 2d 404, 418 N.W.2d 795 (1988), Nordhagen—as a chiropractor—did not have a legal duty to diagnose Murphy's medical condition, or refer her to a medical doctor, and that he had no "informed consent" duty under the facts of the case. We agree and affirm the judgment.

The underlying facts are not in serious dispute. Murphy first visited Nordhagen on January 22, 1993, complaining (according to Nordhagen's notes) of "lower back pain—especially [when] bending, lifting and chang[ing] positions." Nordhagen noted at that time that Murphy had "occ[asional] numbness in [her] buttocks," and that she had not suffered any trauma that might cause the condition. He also recorded that Murphy indicated that the pain in her buttocks and upper legs had grown worse in the past several months. After taking x-rays to rule out a possible fracture or bone tumor, Nordhagen believed that Murphy's condition was more likely "mechanical," rather than the result of disc disease because (a) it had persisted for several months prior to her visit, (b) she was physically active, working in a job that required bending and lifting, and

---

[1] Brenda Murphy's husband, Bruce Murphy, is also a plaintiff in the case, claiming damages for loss of his wife's consortium.

(c) she had received chiropractic treatment for back pain on three prior occasions, most recently in September and December 1992. He then performed a series of "chiropractic adjustments" to her back.

Murphy returned on January 27, 1993, at which time Nordhagen noted: "Still has some pain–numbness seems to be in the 'saddle form'[;] riding seems to make it worse." Suspecting that the numbness was related to "conversion hysteria"—a condition amenable to chiropractic treatment—he conducted several tests which indicated to him that her problems were "probably not a disc." Still uncertain as to the cause of Murphy's back pain, Nordhagen told her that it might have to be checked out with an MRI or CT scan if the pain persisted, and scheduled her to return on February 10, 1993.

Murphy telephoned Nordhagen on February 9, 1993, reporting that she had awakened during the night with vastly increased back pain and numbness in her perineum. According to Murphy, Nordhagen told her she probably had pinched a nerve while sleeping and that it could wait until her scheduled appointment the next day.

At the next day's appointment, Nordhagen noted that, while her pain was "much better," the numbness continued and "seem[ed to be] worse when sleeping on stomach." Nordhagen testified in his deposition that, at that time, he felt that a tumor was still a possibility, and that he might have to "refer her out" if her condition did not significantly improve. He performed more adjustments and suggested to Murphy that he continue to monitor her condition for two to three more weeks.

Murphy telephoned Nordhagen again on either February 12 or February 20, stating that she was

suffering from constipation and could no longer feel her stream of urine, the fullness of her bladder or sexual intercourse. While there is, as indicated, some dispute as to when this conversation took place,[2] Nordhagen said that when she told him she had been constipated for several days, he advised her to see her family physician. In any event, Murphy saw a physician at the Krohn Clinic for her constipation problems on February 24, 1993. At that time, the physician noted that her back pain and numbness had improved and recorded that her condition was probably not a "true spinal cord problem." After telephoning the clinic again on March 2, 1993, she was referred to a neurologist. She was seen two days later and, according to the neurologist's records, reported that "after several chiropractic manipulations [she] started to note some relief and now the pain in the lower back is pretty much gone as of the first week of February." The neurologist's impression was: "History of lower back pain with paresthesias in the buttocks and genitalia with no clear objective neurologic deficit at this time. Rule out a cauda equina lesion."[3] An MRI was performed the next day that revealed a herniated disc. Murphy was admit-

---

[2] Murphy said she telephoned Nordhagen on February 12 and February 20, complaining of constipation and numbness, and that he did not tell her to see a physician until a third conversation on February 27. Nordhagen testified that, when she called him on February 20, he told her to see her family doctor. We do not see this as a material dispute of fact.

[3] The parties use the phrase "cauda equina" and "cauda equina lesion" at various points in their briefs, but they have not seen fit to define the term for us. We assume from our consideration of the expert witnesses' testimony that the term means a bulging or herniated disc, although we are not sure.

ted to the hospital and underwent a lumbar discectomy on March 6, 1993.

We review summary judgments *de novo*, applying the same methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816, 820 (1987). Generally, summary judgment is appropriate in cases in which there is no genuine issue of material fact and the moving party has established his or her entitlement to judgment as a matter of law. *Germanotta v. National Indem. Co.*, 119 Wis. 2d 293, 296, 349 N.W.2d 733, 735 (Ct. App. 1984). Here, the pleadings state and join the issues, and the affidavits and other proofs filed by the parties reveal no disputed issues of material fact, leaving only the legal issues for resolution.[4] *See, e.g., State Bank of La Crosse v. Elsen*, 128 Wis. 2d 508, 511, 383 N.W.2d 916, 917 (Ct. App. 1986).

We begin by considering the appropriate standard of care in chiropractic malpractice cases. The leading case on the subject is *Kerkman v. Hintz*, 142 Wis. 2d 404, 418 N.W.2d 795 (1988), where the supreme court concluded that "chiropractors should not be held to a medical standard," but rather "must exercise that degree of care, diligence, judgment, and skill which is exercised by a reasonable chiropractor under like or similar circumstances." *Id.* at 417, 419–20, 418 N.W.2d at 801–02. Kerkman had sued his chiropractor when his spinal condition deteriorated following a series of chiropractic adjustments. The trial court declined to instruct the jury that the defendant was "required to

---

[4] In negligence actions, the plaintiff must establish the existence of a duty. Whether a duty exists, of course, is a question of law which we review independently. *Coffey v. Milwaukee*, 74 Wis. 2d 526, 531, 247 N.W.2d 132, 135 (1976).

exercise the same degree of care which is usually exercised by a reasonable chiropractor," as Kerkman requested. Instead, relying on an earlier case, *Kuechler v. Volgmann*, 180 Wis. 238, 192 N.W.2d 1015 (1923), the court instructed the jury that a chiropractor is held to the standard of care which is "usually exercised by a recognized school of the medical profession." *Kerkman*, 142 Wis. 2d at 409 n.2, 418 N.W.2d at 798. The jury awarded Kerkman damages, and both parties appealed.

The supreme court concluded that *Kuechler*, which was decided at a time when chiropractors were not licensed professionals, was no longer valid, and that they should be held to a chiropractic, not a medical, standard of care. The court framed the standard as follows:

> [W]e hold that a chiropractor has a duty to (1) determine whether the patient presents a problem which is treatable through chiropractic means; (2) refrain from further chiropractic treatment when a reasonable chiropractor should be aware that the patient's condition will not be responsive to further treatment; and (3) if the ailment presented is outside the scope of chiropractic care, inform the patient that the ailment is not treatable through chiropractic means. In determining whether a chiropractor breaches these duties, [he or she] is held to that degree of care, diligence, judgment, and skill which is exercised by a reasonable chiropractor under like or similar circumstances.

*Kerkman*, 142 Wis. 2d at 420, 418 N.W.2d at 802.

Acknowledging that its holding rejected the rule, operable in several other states, that a chiropractor has a "duty to refer" patients to medical doctors, the

*Kerkman* court rejected the notion of any such duty with respect to chiropractors.

> In holding that a chiropractor does not have a duty to refer, we recognize that a number of states have imposed such a requirement. However, because implicit in a requirement that a chiropractor refer a patient to a medical doctor is the imposition on the chiropractor to make a medical determination that the patient needs medical care, such a determination could not be made without employing medical knowledge. Because a chiropractor is not licensed to make such a determination, we hold that a chiropractor does not have a duty to refer a patient who is not treatable through chiropractic means to a medical doctor.

*Id.* at 421, 418 N.W.2d at 802–03.

It thus appears that Nordhagen's duty in this case was not to determine whether Murphy should be referred to a medical doctor for treatment, but only to determine—in the exercise of the degree of care and skill exercised by reasonable chiropractors under similar circumstances—whether Murphy's "problem" was "treatable through chiropractic means"; and, if it was not, to tell her so.

Murphy argues that her chiropractic experts' testimony establishes Nordhagen's violation of the *Kerkman* standard of care in all respects.[5] We disagree.

---

[5] We are unsure whether Murphy also relies on the testimony of two medical doctors, Dr. David Powell, M.D., and Dr. Fredric M. Somach, M.D., with respect to Nordhagen's claimed negligence. To the extent she does, we note that neither appears to be qualified to testify on the subject. A physician's testimony is admissible on the question of chiropractic negligence, but only if he or she qualifies as an expert "in th[at] field." *Kerkman*

With respect to the first *Kerkman* duty—determining whether the problem is treatable through chiropractic means—the evidence is undisputed that, initially at least, chiropractic treatment was appropriate for the symptoms Murphy presented, as Nordhagen testified. Another chiropractor, Dr. Leo Bronston, D.C., agreed that chiropractic treatment would be appropriate for a patient with either a bulging or herniated disc. He stated: "I would not be critical of [Nordhagen] taking [ Murphy] on in the context that [her] initial presentation in my opinion was a disc involvement." We have not been pointed to any evidence to the contrary.

Establishment of the second *Kerkman* element—whether Nordhagen should have refrained from further chiropractic care because a reasonable chiropractor should have known that Murphy's condition would not respond to such treatment—requires expert testimony that, by a certain date, Nordhagen should have known that Murphy had a problem, or exhibited a symptom, that he could not treat through chiropractic means. Murphy's expert witnesses were primarily critical of Nordhagen for failing to conclude or recognize from her "saddle numbness" that she had a medical problem and should be referred to a physician; or, stated differently, that he failed to "diagnose" the cauda equina[6] and "refer her out"—the very duties the *Kerkman* court rejected as being outside the limita-

---

*v. Hintz*, 142 Wis. 2d 404, 422–23, 418 N.W.2d 795, 803 (1988). Powell testified "I don't know the chiropractic standards of care so I couldn't comment on it," and Somach stated that he is not trained in chiropractic and is not aware of any alternative source in Wisconsin that defines a standard of care for a chiropractor.

[6] *See*, note 3, *supra*.

tions of a chiropractic license.[7] As we have discussed above, however, the *Kerkman* court stated quite plainly that a chiropractor has no such medical-diagnostic or referral duties. Nor is there any testimony that numbness, coupled with lower back pain, is not amenable to chiropractic treatment. To the contrary, Dr. Dana Lawrence, D.C., testified that while numbness is "significant," it does not necessarily mean cauda equina, but rather, "[i]t's just something to consider" in the course of chiropractic care. Nordhagen's testimony was to a similar effect: he stated that he continued treating Murphy because saddle numbness, while a symptom of cauda equina, can also indicate either a back problem in the sacral area or conversion hysteria, both of which are within the ambit of appropriate chiropractic treatment. He also stated that, when previously confronted with patients presenting this symptom, it usually turned out to be conversion hysteria, which he suspected was the case with Murphy.

■

There is, to be sure, a fine line between recognizing the existence of a medical condition from a patient's symptoms, and recognizing that those symptoms

---

[7] Dr. Bronston criticized Nordhagen for "fail[ing] to diagnose [Murphy's] lumbar discopathy," and failing to refer her to "other health care providers . . . to make a more definitive diagnosis." Another chiropractor, Dr. Dana Jeffrey Lawrence, D.C., testified that Nordhagen "should have . . . referred [Murphy] much earlier than she was"—probably during the first visit, when Dr. Nordhagen first questioned a tumor, and "at the very least . . . at the moment saddle anesthesia was mentioned . . . [on] the second visit." He also stated that, in his opinion, Nordhagen's examination of Murphy was "perfunctory," and that "it is probable that he missed the diagnosis" of the disc injury.

represent a condition that is beyond the scope of chiropractic care. On the surface, at least, the realization that a particular physical problem or condition is something that cannot be properly or adequately treated by chiropractic means appears to presuppose the identification (diagnosis) of that problem or condition as one requiring medical treatment. But the language of *Kerkman* compels the result, on this record, that Murphy has failed to establish a duty on Nordhagen's part to do more than he did—which was to treat her up to the point where, because of the additional symptoms she was presenting, he told her to seek other advice.

Murphy argues, however, that Nordhagen was also negligent in failing to secure her "informed consent" to ongoing chiropractic treatment. She begins by citing § 448.30, STATS., the medical informed-consent law—a law which, by its express terms, applies only to "physicians"[8] —and a variety of cases discussing and applying that law to medical malpractice claims. Murphy is in error to the extent she contends either the statute or the cases have any relevance to her lawsuit. They are facially inapplicable to a chiropractic negligence case.

Murphy then narrows the argument somewhat, contending that Nordhagen violated the portion of the *Kerkman* chiropractic negligence standards stating that, where the ailment presented by a patient is "outside the scope of chiropractic care," a chiropractor has a duty to inform the patient that the ailment is "not treatable through chiropractic care." *Kerkman*, 142 Wis. 2d at 420, 421–2, 418 N.W.2d at 803. The problem

---

[8] The statute provides that "[a]ny *physician* who treats a patient shall inform the patient about the availability of all alternate, viable *medical* modes of treatment and about the benefits and risks of these treatments" (emphasis added).

is that Murphy's argument, while couched in *Kerkman* terms, is really one claiming that Nordhagen failed to discover or diagnose her medical condition[9] —and, as we have indicated above, that is an argument *Kerkman* has rendered equally inapposite to claims of chiropractic negligence.

*By the Court.*—Judgment affirmed.

---

[9] The heart of Murphy's argument on the point is as follows:

> At no time did Dr. Nordhagen inform Brenda Murphy that she may have a disc [disease] affecting her spinal cord. At no time did Dr. Nordhagen inform Brenda Murphy that she may have a condition that would lead to her permanent inability to control her bowels. At no time did Dr. Nordhagen inform Brenda Murphy that she may have a condition which would lead to her permanent inability to feel sex or her urinary stream.

Again, there is a fine line between diagnosing a medical condition and determining that the patient's problem is beyond the scope of chiropractic care. *Kerkman* tells us quite unequivocally, however, that a "determination that [a] patient needs medical care" is one that is beyond a chiropractor's professional capabilities because it is a determination "[that] could not be made without employing medical knowledge." *Id.*, 142 Wis. 2d at 421, 418 N.W.2d at 802. And we see Murphy's argument as urging us to apply just such a standard to Nordhagen in this case.