Gary HANNEMANN, Plaintiff-Respondent-Petitioner,

v.

Craig BOYSON, D.C., Defendant-Appellant.

Supreme Court

*No. 2003AP1527. Oral argument February 2, 2005.
—Decided June 29, 2005.*

2005 WI 94

(Also reported in 698 N.W.2d 714.)

For the plaintiff-respondent-petitioner there were briefs by *John C. Peterson, Jolene D. Schneider* and *Peterson, Berk & Cross, S.C.,* Appleton, and oral argument by *John C. Peterson.*

For the defendant-appellant there was a brief by *Thomas R. Schrimpf, Patrick F. Koenen, Jeffrey D. Patza,* and *Hinshaw & Culbertson, LLP,* Milwaukee, and oral argument by *Patrick F. Koenen.*

¶ 1. JON P. WILCOX, J. The plaintiff, Gary Hannemann (Hannemann), seeks review of a published court of appeals decision, *Hannemann v. Boyson,* 2004 WI App 96, ¶ 1, 273 Wis. 2d 457, 681 N.W.2d 561,

affirming in part, reversing in part, and remanding with directions a judgment of the Outagamie County Circuit Court, Harold V. Froehlich, Judge. The circuit court entered judgment on the jury verdict in favor of Hannemann in his chiropractic malpractice case against the defendant, Dr. Craig Boyson (Boyson). The court of appeals held, inter alia, that the special verdict submitted to the jury was erroneous because it asked only whether Boyson was negligent in his treatment of Hannemann and did not separately ask whether Boyson failed to obtain Hannemann's informed consent for the procedure that allegedly caused his injury. *Id.*[1]

¶ 2. We agree with Boyson and the court of appeals that negligent treatment and failure to obtain informed consent in the context of chiropractic malpractice are two different issues that require separate verdict questions. We conclude that although the practice of chiropractic and the practice of medicine are distinct health care professions, the obligation of the practitioners of both to disclose the risks of the treatment and care they provide should be the same. While the actual disclosures will inevitably vary between doctors and chiropractors, the nature of the duty and limitations thereon should be the same. A patient of chiropractic has the same right as a patient of medical practice to be informed of the material risks of the proposed treatment or procedure so that he may make an informed decision whether to consent to the proce-

---

[1] The court of appeals rejected Boyson's other arguments that the circuit court erred by eliminating language from the standard informed consent jury instruction and by giving a standard causation instruction. *Hannemann v. Boyson*, 2004 WI App 96, ¶ 1, 273 Wis. 2d 457, 681 N.W.2d 561. Boyson did not file a cross appeal on these issues and we therefore do not address them.

dure or treatment. As such, we hold that the scope of a chiropractor's duty to obtain informed consent is the same as that of a medical doctor.

¶ 3. Furthermore, we conclude that the circuit court's failure to submit a separate special verdict on informed consent after separately instructing the jury on negligent treatment and informed consent constituted prejudicial error. We therefore affirm the decision of the court of appeals reversing part of the judgment of the circuit court and remanding the case for a new trial.

## I. FACTUAL BACKGROUND

¶ 4. On August 21, 2000, Hannemann filed a complaint against Boyson in Outagamie County Circuit Court, alleging that "[f]rom August 7 through August 23, 1997, the defendant negligently provided chiropractic treatment to the plaintiff, Gary Hannemann, as a proximate consequence to which the plaintiff suffered serious and permanent injury . . . ." As stated with more particularity in his scheduling conference statement, Hannemann alleged that "[t]he defendant negligently adjusted the plaintiff's cervical spine resulting in the plaintiff suffering a stroke with permanent disability."

¶ 5. A four-day jury trial was held beginning on August 15, 2003. During voir dire, Hannemann's attorney began arguing the theory that Boyson failed to provide informed consent by asking the potential jurors if they thought it was wrong for a doctor to warn a patient about the possibility of harm before performing a procedure, even if "it's a very remote risk" that may result in serious injury or death. During opening statements, Hannemann's attorney concentrated on Boyson's alleged failure to discuss the risks inherent in performing a cervical adjustment with Hannemann and his failure to perform appropriate tests on Hannemann.

¶ 6. The following facts and factual disputes were developed at trial. Hannemann began seeing Boyson in July 1996 due to lower back spasms and headaches he experienced as a result of his job, which required long periods of driving. Hannemann had previously undergone a spinal fusion operation. Boyson testified that Hannemann also complained of numbness and tingling in his arm. Boyson stated that he took a patient history and performed various tests on Hannemann. It is undisputed that Boyson did not perform a "George's Test," which is designed to test for neurovascular injuries, because he believed such a test was invalid. However, Boyson testified that he performed several other tests that served the same purpose as the "George's Test." He also stated that he performed x-rays on Hannemann.

¶ 7. Boyson diagnosed Hannemann with cervical subluxation dysfunction. Boyson testified that when Hannemann began his treatment, he described the proposed treatment and discussed the various risks and benefits of chiropractic adjustment. The record indicates that Hannemann signed informed consent forms on two occasions.[2] However, it is undisputed that Boyson did not warn Hannemann that chiropractic treat-

---

[2] The forms, dated July and November 1996, provide, in pertinent part:

> I the undersigned, a patient in this office, hereby authorize BOYSON CHIROPRACTIC OFFICE to administer such treatment as is necessary, and to perform the following therapy and manipulation and such additional therapy or procedures as are considered therapeutically necessary on the basis of findings during the course of said treatment.

> I hereby certify that I have read and fully understand the reasons above Authorization for Chiropractic Treatments, the reasons why the above named treatment is considered necessary, its advantage

ment carried a risk of the patient suffering a stroke or other neurovascular injuries. Boyson explained that the reason he never discussed the risk of stroke was that to his recollection, at the time there was no definitive correlation between chiropractic adjustments and stroke and that "the risk of that is so astronomical that it wasn't a major factor."

¶ 8. Throughout the course of his treatment, Boyson performed adjustments on Hannemann's entire spine and neck in order to place it in proper alignment. After a gap in his treatment, Hannemann saw Boyson in November 1996, following his involvement in an automobile accident. In July 1997, Hannemann saw a medical doctor for headaches and neck stiffness and was diagnosed with a form of viral meningitis.

¶ 9. Following another two-month gap in chiropractic treatment, Hannemann returned again to see Boyson on August 7, 1997, complaining of severe headaches. Boyson testified that he took a brief patient history of Hannemann and performed a brief exam. Boyson testified that Hannemann did not inform him of his meningitis diagnosis during this visit.

¶ 10. Hannemann again saw Boyson after a long day of driving on Thursday, August 21, 1997, complaining of lower back spasms and headaches. Hannemann testified that Boyson administered an adjustment to his lower back and neck. However, Hannemann stated that when Boyson adjusted his neck this time, he experienced a great deal of pain and heard a loud "crack." Hannemann stated that Boyson did not respond when

and possible complications, if any, as well as possible alternative modes of treatment, which were explained to me by BOYSON CHIROPRACTIC OFFICE.

I also certify that no guarantee or assurance has been made as to the results that may be obtained.

he stated that he had experienced an unusual amount of pain after the adjustment. Boyson testified that the adjustment he administered on that date was no different than his previous adjustments. Boyson also stated that he performed electrical muscle stimulation therapy on that date. Boyson denied Hannemann ever told him the adjustment caused him pain.

¶ 11. The next day, Hannemann began experiencing unusual symptoms that prompted him to call Boyson's office. Hannemann testified that his leg was acting up and he was having difficulty walking. Hannemann made an appointment to see Boyson the following day, even though Boyson's office was generally closed on Saturdays.

¶ 12. Boyson testified that when Hannemann saw him on Saturday, August 23, Hannemann indicated he had developed numbness and tingling in his legs and under his foot, as well as a warm sensation in his thighs. Boyson indicated that he had a discussion with Hannemann concerning his prior bout of meningitis at this point. Boyson stated he checked Hannemann for fixation and performed a series of tests that indicate whether a patient is suffering from meningitis. Boyson stated all tests came back negative.

¶ 13. Hannemann testified that Boyson asked him a series of questions, checked his reflexes, probed his body for pain, and then performed an adjustment to his neck. Hannemann stated that this adjustment was similar to the one he received on Thursday, although he stated this one did not cause him pain. Hannemann denied that Boyson advised him to go to the hospital or seek medical attention.

¶ 14. Boyson denied that he performed an adjustment on Hannemann that Saturday and instead testified that he performed "a manual therapy technique[.]"

Boyson also stated that he recommended Hannemann see a medical doctor as soon as possible.

¶ 15. Over the course of the day, Hannemann continued to experience a tingling feeling in his leg. Hannemann went to bed that evening and awoke at 3:00 a.m. the next morning, unable to move one side of his body. Hannemann also began experiencing urinary tract problems. He was admitted to the emergency room and diagnosed with having suffered a stroke.

¶ 16. Hannemann's standard of care expert witness, Dr. Kenneth Murkowski, testified that Boyson's treatment of Hannemann in August fell below the chiropractic standard of care because Boyson did not perform a series of diagnostic tests, including the "George's Test," which would indicate whether a patient was susceptible to neurovascular injury. Boyson, in contrast, presented evidence from Dr. Jeffrey Wilder that the general consensus in the chiropractic community was that the "George's Test" was invalid and that there is no way to screen a patient who may develop post-adjustment problems. Wilder testified that Murkowski's opinions were based on an erroneous view of the facts and that Boyson's treatment of Hannemann on August 21 and 23 did not deviate from the standard of care.

¶ 17. Murkowski also testified that Boyson was negligent in that he failed to obtain informed consent because Murkowksi could "find no informed consent in the records at all." Specifically, he stated that informed consent should include a warning to the patient that one of the risks of chiropractic treatment is neurovascular injury, including stroke. Hannemann maintained that he would not have subjected himself to the adjustment had he known of the risk of stroke. Wilder testified that Boyson did, in fact, obtain informed consent, and that the record reflected this was done on

two occasions. He stated that he had no clinical criticism of Boyson for failing to inform Hannemann about the possible risk of a stroke. However, during cross-examination, Wilder admitted that most informed consent forms, including the ones he personally had used, disclosed the risk of neurovascular injury as a remote consequence of cervical adjustment.

¶ 18. Hannemann also presented evidence that the very act of performing a cervical adjustment in the face of unexplained neurological symptoms constituted negligence.

¶ 19. The parties disagreed as to whether the cervical adjustment Boyson allegedly administered on August 23, 1997, was the cause of Hannemann's stroke, or whether the stroke was the result of complications from Hannemann's viral meningitis. The parties also disputed whether there is a recognized link between stroke and cervical adjustments and, if so, the frequency with which stroke is connected to cervical adjustments. As Hannemann's expert testified, the statistics "are all over the place," and the reported instances of such occurrences ranged anywhere from one in a million to 55 out of 177.

¶ 20. At the close of evidence, the parties disputed what instructions should be read to the jury. Specifically, the parties disagreed as to whether the limitations on the informed consent obligations of medical doctors should apply to chiropractors and whether the jury should be instructed as to negligence and informed consent, or simply negligence. Hannemann argued that informed consent for chiropractic is simply part of the standard of care, whereas Boyson argued informed consent is a separate obligation that focuses on what a reasonable patient would want to know and is not dependent on the standards in the chiropractic community.

¶ 21. The parties also disagreed as to the form of the special verdict. Boyson argued that the questions on informed consent and negligence be submitted separately to the jury. Hannemann argued that the jury should be asked to answer only the question of negligence in treatment because informed consent is simply part of the standard of care. The court decided to submit only the negligence verdict, stating: "We are not going to mess with the verdict. Let the appellate court straighten this case out if it leads to it."

¶ 22. During closing arguments when discussing liability, Hannemann's attorney again focused greatly on the fact that Boyson allegedly failed to obtain the proper informed consent. While he also argued that Boyson was negligent in failing to perform appropriate tests on Hannemann, namely, the "George's Test," his main argument was that Boyson was negligent because he failed to discuss the risks of neurovascular injury:

> What did the doctor not do? He didn't recognize the problem and he did not inform on that Saturday morning, he did not inform Gary Hannemann of the risk that he was about to confront with another adjustment. He did not tell him, Gary it's a known fact that there is an association between cervical adjustment and people who have strokes. He did not tell him you had developed very strange neurological symptoms that may indicate that you're in the process of having a neurovascular injury. He did not tell him there are options, maybe you should go to a medical doctor, maybe we should do nothing.
>
> What he did is he decided to proceed with an adjustment, that is exactly what he did. . . . He didn't talk to Gary about the risks. He didn't do a complete neurological and orthopedic exam. . . . He didn't tell Gary to get medical help.

¶ 23. Following closing arguments, the circuit court instructed the jury. The court read a modified version of Wis JI—Civil 1023.8, Professional Negligence: Chiropractor-Treatment. The court also read a modified version of Wis JI—Civil 1023.2, governing medical informed consent. The court instructed the jury:

> A chiropractor has the duty to provide his patient with information necessary to enable the patient to make an informed decision about a procedure and alternative choices of treatments. If the chiropractor fails to perform this duty, he is negligent.
>
> To meet this duty to inform his patient, the chiropractor must provide his patient with the information a reasonable person in the patient's position would regard as significant when deciding to accept or reject the medical treatment. In answering this question, you should determine what a reasonable person in the patient's position would want to know in consenting to or rejecting a chiropractic treatment.
>
> However, the chiropractor's duty to inform does not require disclosure of:
>
> > Information beyond what a reasonably, well-qualified chiropractor in a similar classification would know; Extremely remote possibilities that might falsely or detrimentally alarm the patient.[3]

---

[3] Wisconsin JI—Civil 1023.2, Professional Negligence: Medical: Informed Consent (2001), provides:

Question ____ asks:

Did (doctor) fail to disclose information about the (insert treatment or procedure) necessary for (*patient*) to make an informed decision?

¶ 24. However, the court submitted only a negligence verdict to the jury, which asked, in pertinent part:

A doctor has a duty to provide (his)(her) patient with information necessary to enable the patient to make an informed decision about a (diagnostic)(treatment)(procedure) and alternative choices of (diagnostic)(treatments)(procedures). If the doctor fails to perform this duty, (he)(she) is negligent.

To meet this duty to inform (his)(her) patient, the doctor must provide (his)(her) patient with the information a reasonable person in the patient's position would regard as significant when deciding to accept or reject (a)(the) medical (diagnostic)(treatment)(procedure). In answering this question, you should determine what a reasonable person in the patient's position would want to know in consenting to or rejecting a medical (diagnostic)(treatment)(procedure).

The doctor must inform the patient whether (a)(the)(diagnostic)(treatment)(procedure) is ordinarily performed in the circumstances confronting the patient, whether alternate (treatments)(procedures) approved by the medical profession are available, what the outlook is for success or failure of each alternate (treatment)(procedure), and the benefits and risks inherent in each alternate (treatment)(procedure).

However, the physician's duty to inform does not require disclosure of:

[• Information beyond what a reasonably, well-qualified physician in a similar medical classification would know;]

[• Detailed technical information that in all probability the patient would not understand;]

[• Risks apparent or known to the patient;]

[• Extremely remote possibilities that might falsely or detrimentally alarm the patient;]

[• Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment;]

[• Information in cases where the patient is incapable of consenting.]

679

*Question 1:* Was Dr. Craig Boyson negligent with respect to his care and treatment of Gary Hannemann in August of 1997?

*Answer:* ____

*Question 2:* If you answered question 1 above "yes," please answer the following question. Was the negligence of Dr. Craig Boyson a cause of Gary Hannemann's neurovascular injury?

*Answer:* ____

*Question 3:* Was Gary Hannemann negligent with respect to his own care by failing to follow the instructions of his treating physicians?

*Answer:* ____

*Question 4:* If you answered question 3 above "yes," please answer the following question. Was the negligence of Gary Hannemann a cause of his neurovascular injury?

*Answer:* ____

¶ 25. The court did not submit a special verdict question on informed consent.[4] The jury answered questions one through three "yes" and answered "no" to question four. The jury awarded Hannemann $227,000 in damages.

[If (*doctor*) offers you an explanation as to why (he)(she) did not provide information to (*plaintiff*), and if this explanation satisfies you that a reasonable person in (*plaintiff*)'s position would not have wanted to know that information, then (*doctor*) was not negligent].

[4] Wis JI—Civil 1023.1 Professional Negligence: Medical: Informed Consent: Special Verdict (2001), provides:

Questions 1, 2, and 3 of the special verdict form relate to the issue of informed consent and read as follows:

680

## II. PROCEDURAL POSTURE

¶ 26. On March 10, 2003, Boyson filed a motion for a new trial, arguing, inter alia, that the circuit court erred in failing to include special verdict questions on informed consent consistent with Wis JI—Civil 1023.1. By order dated May 2, 2003, the circuit court denied the motion for a new trial. On that same day, the circuit court entered judgment on the verdict.

¶ 27. Boyson appealed the judgment, and the court of appeals reversed in part, concluding that "failure to obtain informed consent and negligent treatment are two different issues that require different

**Question 1:** Did (*doctor*) fail to disclose information about the (insert treatment or procedure) necessary for (*patient*) to make an informed decision?

Answer: _____

Yes or No

**Question 2:** If you answered question 1 "yes," then answer this question: If a reasonable person, placed in (*patient*)'s position, had been provided necessary information about the (insert treatment or procedure), would that person have (refused)(accepted) the (insert treatment or procedure)?

Answer: _____

Yes or No

**Question 3:** If you have answered both questions 1 and 2 "yes," then answer this question: Was the failure by (*doctor*) to disclose necessary information about (insert treatment or procedure) a cause of injury to (*patient*)?

Answer: _____

Yes or No

681

verdict questions." *Hannemann,* 273 Wis. 2d 457, ¶ 1. The court of appeals reasoned that while Wis JI—Civil 1023.1 is based on a statute governing medical informed consent, Wis. Stat. § 448.30 (2003–04),[5] "the legal theories of informed consent for medical doctors and for chiropractors are the same." *Id.,* ¶ 20. The court of appeals stated that both theories are based on the patient's right to self-determination, including the right to refuse treatment. *Id.,* ¶ 19.

¶ 28. In addition, the court of appeals found it significant that both medical doctors and chiropractors are health care providers and both are licensed by state examining boards. *Id.,* ¶ 21. Further, the court of appeals noted that while *Murphy v. Nordhagen,* 222 Wis. 2d 574, 584, 588 N.W.2d 96 (Ct. App. 1998), stated that informed consent did not apply to chiropractors,[6] the Chiropractic Examining Board created Wis. Admin. Code § Chir 11.02(5)(May, 1997),[7] which contains an explicit requirement that chiropractors keep records of patients' informed consent. *Hannemann,* 273 Wis. 2d 457, ¶ 19. Therefore, it held that Wis JI—Civil 1023.1

---

[5] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

[6] Neither party contends that the concept of informed consent is wholly inapplicable to chiropractors.

[7] Wisconsin Admin. Code § Chir 11.02(5) appeared in the administrative register in May 1997 and was effective June 1, 1997. This provision has not changed since it was first promulgated. *See* Wis. Admin. Code § Chir 11.02(5) (July, 2004). Therefore, all references to the administrative code are to the May 1997 version unless otherwise indicated. It is noteworthy that the court of appeals in *Murphy v. Nordhagen,* 222 Wis. 2d 574, 584, 588 N.W.2d 96 (Ct. App. 1998), did not mention this administrative code provision in its brief discussion of informed consent.

"is a model for chiropractic negligence as well as medical informed consent." *Id.*, ¶ 21.

¶ 29. Further, the court of appeals noted that a special verdict must cover all material issues of ultimate fact and that here, the jury was not asked to determine whether the three elements of failure to obtain informed consent were present. The court therefore ruled that "the verdict questions did not cover the material issues of ultimate fact necessary to prove Boyson failed to obtain Hannemann's informed consent." *Id.*, ¶ 22. Finally, the court concluded that the circuit court's error in failing to submit a separate verdict on informed consent was not harmless: "[W]e do not know whether the jury found Boyson guilty of negligent treatment or failure to obtain informed consent. Thus, we conclude it is reasonably possible the error affected the jury's determination." *Id.*, ¶ 24.

## III. ISSUE

¶ 30. The precise issue on appeal is whether the circuit court erred in failing to submit a special verdict on informed consent.[8] The form of the special verdict is within the circuit court's discretion, so long as it covers all material issues of fact. *Meurer v. ITT Gen. Controls,* 90 Wis. 2d 438, 445–46, 280 N.W.2d 156 (1979). In the present case, the circuit court submitted the special verdict on negligent chiropractic treatment. It did not submit a separate special verdict on the issue of informed consent, although it instructed the jury on

---

[8] We emphasize that we do not address the issue of informed consent for health care providers not discussed in this opinion.

informed consent. Whether the circuit court erred in failing to submit special verdict questions on informed consent is dependent upon the scope of a chiropractor's duty of informed consent and whether all material issues of ultimate fact pertinent thereto were covered under the negligent treatment special verdict. The scope of a legal duty is a question of law. *Wiegert v. Goldberg,* 2004 WI App 28, ¶ 12, 269 Wis. 2d 695, 676 N.W.2d 522.

## IV. ANALYSIS

### A. Scope of Chiropractic Informed Consent

¶ 31. The issue in this case concerns the scope of a chiropractor's duty to obtain informed consent from his patient before proceeding with treatment and whether such duty is similar to a medical doctor's duty to obtain informed consent. Boyson argues that a chiropractor's duty to obtain informed consent is subject to the same parameters and limitations as that of a physician and that a failure to obtain informed consent constitutes a separate basis for finding a chiropractor liable in a malpractice action. Hannemann contends that chiropractic informed consent is not governed by the same standards as informed consent in the medical context. Hannemann asserts that a chiropractor's informed consent obligations are limited to the standard form patients sign before beginning treatment. According to Hannemann, informed consent in chiropractic is not a separate basis upon which a chiropractor can be found liable in a malpractice action; rather, it is simply part of the chiropractic standard of care. For the foregoing reasons, we agree with Boyson.

¶ 32. In *Murphy,* 222 Wis. 2d at 584–85, the court of appeals, with very little analysis, determined that the

law of informed consent was "facially inapplicable to a chiropractic negligence case." *Murphy* reasoned that the law of informed consent was based on § 448.30, whose explicit language applies only to physicians. *Id.* Neither party in the present dispute argues that the law of informed consent is entirely inapplicable to the practice of chiropractic.

¶ 33. A year before *Murphy* was decided, the Chiropractic Examining Board promulgated Wis. Admin. Code § Chir 11.02, entitled "Patient record contents." Wisconsin Admin. Code § Chir 11.02(5) provides: "Patient records shall include documentation of informed consent of the patient, or the parent or guardian of any patient under the age of 18, for examination, diagnostic testing and treatment." The code provision was made effective June 1997. Therefore, there is no dispute that a chiropractor has an obligation to obtain informed consent; rather, the question is what that duty entails. As the administrative code does not describe the obligation to secure informed consent or set forth any parameters or limitations on the obligation, we examine the concept of informed consent under our common law.

¶ 34. The concept of informed consent in this state originated in context of medical malpractice. A physician's failure to obtain a patient's permission for a non-emergency procedure was considered an assault and battery, in that it constituted an unwanted touching of another person. *Trogun v. Fruchtman,* 58 Wis. 2d 569, 596, 598, 207 N.W.2d 297 (1973). The obligation to secure informed consent before performing a procedure was premised on the notion that "a person of sound mind has a right to determine, even as against his physician, what is to be done to his body." *Id.* at 596.

¶ 35. In *Trogun,* this court determined that it was no longer appropriate to treat the failure to obtain informed consent as an assault and battery and instead "recognize[d] a legal duty, bottomed upon a negligence theory of liability, in cases wherein it is alleged the patient-plaintiff was not informed adequately of the ramifications of a course of treatment." *Id.* at 600. However, even under this negligence-based theory, a physician's obligation to disclose risks and obtain consent is determined in light of what a reasonable patient would want to know when making a medical decision rather than the standard for disclosure in the relevant community. *Id.* at 601–04. In other words, even under the negligence theory of informed consent, " *'the patient's right of self-decision is the measure of the physician's duty to reveal.'* " *Id.* at 602 (quoting *Cobbs v. Grant,* 502 P.2d 1, 11 (Cal. 1972))(emphasis added).

¶ 36. Therefore, applying the *Trogun* theory of informed consent, this court has held:

> [A] physician has a duty to make a reasonable disclosure to his patient of the significant risks in view of the gravity of the patient's condition, the probabilities of success, and any alternative treatment or procedures if such are reasonably appropriate so that the patient has the information reasonably necessary to form the basis of an intelligent and informed consent to the proposed treatment or procedure.

*Scaria v. St. Paul Fire & Marine Ins. Co.,* 68 Wis. 2d 1, 11, 227 N.W.2d 647 (1975). The duty is not measured by the standards used in the relevant medical community because:

> The right to be recognized and protected is the right of the patient to consent or not to consent to a proposed medical treatment or procedure. Because of the

patient's lack of professional knowledge, he cannot make a rational reasonable judgment unless he has been reasonably informed by the doctor of the inherent and potential risks. The right of the patient and the duty of the doctor are standards recognized and circumscribed by the law and are not entirely dependent upon the customs of the profession.

*Id.* at 12.

¶ 37. As the duty to disclose the risks of medical procedures and treatment arises from the patient's right to make an informed decision and refuse the bodily intrusion accompanied by the procedure or treatment, there are limits to what a doctor must disclose:

> A doctor should not be required to give a detailed technical medical explanation that in all probability the patient would not understand. He should not be required to discuss risks that are apparent or known to the patient. Nor should he be required to disclose extremely remote possibilities that at least in some instances might only serve to falsely or detrimentally alarm the particular patient. Likewise, a doctor's duty to inform is further limited in cases of emergency or where the patient is a child, mentally incompetent or a person is emotionally distraught or susceptible to unreasonable fears.

*Id.* at 12–13.

¶ 38. Moreover, a doctor's duty to disclose the risks of treatments or procedures is limited to those risks that a reasonable person would want to know. *Id.* at 15. Thus, it is not sufficient for a patient to demonstrate that in hindsight he would not have undergone the procedure if he had been appraised of the risks; rather, there must be proof that a reasonable person,

687

when appraised of the risks involved, would not have consented to the procedure in question. *Id.*

¶ 39. In essence, a doctor must "make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to intelligently exercise his right to consent or to refuse the treatment or procedure proposed." *Id.* at 13. In other words,

> A physician who proposes to treat a patient or attempt to diagnose a medical problem must make such disclosures as will enable a reasonable person under the circumstances confronting the patient to exercise the patient's right to consent to, or refuse the procedure proposed or to request an alternative treatment or method of diagnosis.

*Martin v. Richards,* 192 Wis. 2d 156, 176, 531 N.W.2d 70 (1995). However, obtaining informed consent is not necessarily a one-time occurrence: "a substantial change in circumstances, be it medical or legal, requires a new informed consent discussion." *Fischer v. Wis. Patients Comp. Fund,* 2002 WI App 192, ¶ 17, 256 Wis. 2d 848, 650 N.W.2d 75 (citing *Schreiber v. Physicians Ins. Co.,* 223 Wis. 2d 417, 437, 588 N.W.2d 26 (1999)).

¶ 40. Although liability for failure to obtain informed consent is premised on negligence principles, it is nonetheless treated under the law as a separate and distinct form of malpractice: "A failure to diagnose is one form of medical malpractice. A failure to obtain informed consent is another discrete form of malpractice, requiring a consideration of additional and different factors." *Finley v. Culligan,* 201 Wis. 2d 611, 628,

548 N.W.2d 854 (Ct. App. 1996) (citing *Knief v. Sargent,*
40 Wis. 2d 4, 8, 161 N.W.2d 232 (1968)); Wis JI—Civil
1023). "[T]he touchstone of the test [for informed
consent] [i]s what the reasonable person in the position
of the patient would want to know." *Schreiber,* 223 Wis.
2d at 427.

¶ 41. We see no reason why these principles of
informed consent, while initially developed and applied
in the context of medical malpractice, are not equally
applicable to chiropractors. Hannemann's main argu-
ment against applying the above principles of informed
consent is that chiropractors are not medical doctors,
do not practice medicine, and are not subject to the
same standard of care as physicians. Hannemann is
correct that there are obvious differences between the
practice of chiropractic and the practice of medicine.

> [T]he legislature has recognized the practice of chiro-
> practic as a separate and distinct health care disci-
> pline. . . . [B]y limiting chiropractors to the use of
> chiropractic adjustments and the principles or tech-
> niques of chiropractic science in the diagnosis, treat-
> ment or prevention of disease while prohibiting the use
> of traditional medical tools, e.g., drugs or surgery, the
> legislature has recognized that the practice of chiro-
> practic is distinct from the practice of medicine.

*Kerkman v. Hintz,* 142 Wis. 2d 404, 415–16, 418 N.W.2d
795 (1988). More specifically,

> [A] chiropractor does not treat or diagnose disease.
> Instead, a chiropractor's practice is limited to the
> analysis and correction of subluxation. The
> chiropractor's function is to locate the subluxation, if it
> exists, adjust it back to the correct position, and then
> allow the body to restore itself to normalcy. A medical
> doctor's practice, on the other hand, is completely

689

opposite. The medical doctor is concerned with the diagnosis and treatment of the diseased area through the use of drugs and surgery or other techniques.

*Id.* at 416.

¶ 42. However, "[i]n licensing chiropractors to examine into the cause of departure from complete health and by authorizing chiropractors to diagnose, treat or prevent disease, the legislature has recognized chiropractors as providers of health care." *Id.* at 415–16. Furthermore, our courts have determined that chiropractors are "health care providers" under Wis. Stat. § 893.55, which sets forth the limitation period for medical malpractice claims against health care providers. *Arenz v. Bronston,* 224 Wis. 2d 507, 515, 592 N.W.2d 295 (Ct. App. 1999). Thus, while the practice of chiropractic is separate and distinct from that of medicine, it is nonetheless a "health care discipline." *Kerkman,* 142 Wis. 2d at 415–16. In *Arenz,* the court of appeals reasoned that chiropractors met the statutory definition of "health care provider" because, like medical doctors, "[t]hey are involved in the diagnosis, treatment or care of their patients, and they are licensed by a state examining board." *Arenz,* 224 Wis. 2d at 515.

¶ 43. As discussed *supra,* the concept of informed consent developed out of the right of every person to refuse unwanted medical treatment and control what is done to his body. "The doctrine of informed consent comes from the common law and stems from the fundamental notion of the right to bodily integrity[.]" *Martin,* 192 Wis. 2d at 169. These principles continue to form the basis of the modern concept of informed consent. *Trogun,* 58 Wis. 2d at 602. Thus, the right to informed consent arises not from anything peculiar to

the medical profession, but from the "notion that an adult has a 'right to determine what shall be done with his own body . . . .'" *Schreiber,* 223 Wis. 2d at 426 (quoting *Schloendorff v. Soc'y of New York Hosp.,* 105 N.E. 92, 93 (N.Y. 1914), *overruled on other grounds* by *Bing v. Thunig,* 143 N.E.2d 3 (N.Y. 1957)).

¶ 44. Medical doctors are obligated to disclose and discuss the material risks of any given procedure or treatment with their patients so that their patients may make informed decisions as to whether they want to consent to bodily intrusions and proceed with the recommended procedure or treatment. Chiropractors, like medical doctors, are health care professionals involved in the application of procedures and treatments to the human body. We see no reason why the scope of an individual's right to be informed of the risks inherent in bodily intrusions via chiropractic treatment and procedures should be any different from his right to be informed of the risks inherent in bodily intrusions via medical treatment and procedures.

¶ 45. While the two disciplines are distinct forms of health care, there is no logical reason why a patient of chiropractic should not have the same right as a patient of medical practice to be informed of the risks material to proposed treatments or procedures so as to be able to make an informed decision and consent to the proposed treatments or procedures. In other words, while the specific treatments and procedures utilized in the practice of chiropractic and the practice of medicine may differ, there is no reason why the practitioners of these disciplines should not have the same obligation to disclose the material risks of the procedures and treatments they utilize.

¶ 46. We reject Hannemann's repeated assertions that informed consent in chiropractic is merely a one-

time obligation that is satisfied by simply providing a form before beginning treatment. The form may be evidence or documentation of the risks disclosed to a patient, but the form itself is not informed consent. Informed consent is "mak[ing] such disclosures as will enable a reasonable person under the circumstances confronting the patient to exercise the patient's right to consent to, or to refuse the procedure proposed or to request an alternative treatment or method of diagnosis." *Martin,* 192 Wis. 2d at 176. In other words, informed consent is a duty to "make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to intelligently exercise his right to consent or to refuse the treatment or procedure proposed." *Scaria,* 68 Wis. 2d at 13.

¶ 47. Although the specifics of the disclosures will undoubtedly vary between the practice of medicine and the practice of chiropractic, the rules governing the scope and limits of the duty to disclose and obtain informed consent should be the same. The scope and limits of the duty to disclose material risks and obtain informed consent are aptly set forth in Wis JI—Civil 1023.1. While this instruction may need to be modified when applied to chiropractors, this can easily be accomplished.

¶ 48. Hannemann's last argument is that Wis JI—Civil 1023.1 should not apply to chiropractors because the jury instruction is based on § 448.30, which applies only to physicians. Section 448.30 requires physicians to make certain disclosures pertaining to all viable modes of treatment. *Schreiber,* 223 Wis. 2d at 428. Section 448.30 first became effective in 1982. *See*

§ 2, ch. 375, Laws of 1981. In contrast, Wis JI—Civil 1023.1 was first adopted following this court's decisions in *Trogun* and *Scaria* in 1975. *See* Law Note, Wis JI—Civil 1023.1. Moreover, § 448.30 was enacted in order to codify the common-law standards for informed consent set forth in *Scaria. See Schreiber,* 223 Wis. 2d at 427–28; Law Note, Wis JI—Civil 1023.1. Furthermore, the scope and limitations on the duty of informed consent in Wis JI—Civil 1023.1 all derive from *Trogun* and its progeny, which adopted the reasonable patient standard for informed consent. *See Martin,* 192 Wis. 2d at 176; *Scaria,* 68 Wis. 2d at 13; *Trogun,* 58 Wis. 2d at 601–04. Therefore, a physician's duty to obtain informed consent, while codified in § 448.30, is not dependent on that statute for its existence. While our common-law informed consent jurisprudence has been codified with respect to one health care profession, we are not prohibited from extending that common law to another health care profession.

¶ 49. In sum, we conclude that a chiropractor's duty of informed consent is to "make such disclosures as will enable a reasonable person under the circumstances confronting the patient to exercise the patient's right to consent to, or to refuse the procedure proposed or to request an alternative treatment or method of diagnosis." *Martin,* 192 Wis. 2d at 176. He must "make such disclosures as appear reasonably necessary under circumstances then existing to enable a reasonable person under the same or similar circumstances confronting the patient at the time of disclosure to intelligently exercise his right to consent or to refuse the treatment or procedure proposed." *Scaria,* 68 Wis. 2d at 13.

## B. Special Verdict Question

██

¶ 50. Having determined that the scope of a chiropractor's duty to obtain informed consent is the same as that of a medical doctor, we next address whether the circuit court erred in failing to submit special verdict questions on informed consent. A special verdict must cover all material issues of ultimate fact. Wis. Stat. § (Rule) 805.12(1). The material issues of ultimate fact for a failure to provide informed consent are as follows: (1) the patient was not informed of the risks in the proposed treatment or procedure of which a reasonable person in the patient's position would wish to be made aware; (2) a reasonable person in the patient's position presented with such information would not have chosen to submit to the treatment or procedure; and (3) the failure to disclose such information was a cause of the patient's injuries. *Martin,* 192 Wis. 2d at 176, 182–83; *Scaria,* 68 Wis. 2d at 13–17; Wis JI—Civil 1023.1.

¶ 51. Here, the jury was not asked to find these ultimate issues of fact. Rather, the jury was asked only whether Boyson was negligent in treating Hannemann and whether such negligent treatment was the cause of Hannemann's injuries. The jury simply was not asked to find the three material issues of ultimate fact for failure to provide informed consent.

¶ 52. We note that generally "[w]here a party might be found negligent in several respects a single question as to that party's negligence is permissible." *Meurer,* 90 Wis. 2d at 446. However, a failure to provide informed consent is a form of malpractice separate and discrete from negligence in treatment: "A failure to diagnose is one form of medical malpractice. A failure to

694

obtain informed consent is another discrete form of malpractice, *requiring a consideration of additional and different factors." Finley,* 201 Wis. 2d at 628 (emphasis added).

■■■

¶ 53. While the modern concept of informed consent is based on negligence principles, providing negligent treatment and failing to provide informed consent involve the violation of two separate duties and "the standards by which these duties must be measured are somewhat different[.]" *Scaria,* 68 Wis. 2d at 20. As previously discussed, the duty to provide reasonable care in treatment is defined by the standards in the chiropractic community, whereas the duty to obtain informed consent is defined by what information a reasonable patient would want to know.

¶ 54. Thus, this court has held that upon a proper motion the question of failure to provide informed consent should be stated separately from the question of negligent treatment. *Id.* The court of appeals has held that a claim of informed consent is a separate cause of action that requires amendment of the pleadings or the implied consent of the parties to try the issue when the plaintiff pleads only negligence in treatment. *Finley,* 201 Wis. 2d at 629. In *Martin,* 192 Wis. 2d at 182–83, this court all but stated that an informed consent verdict that omits a cause question is fatally defective.[9]

---

[9] The verdict in *Martin v. Richards,* 192 Wis. 2d 156, 182–83, 531 N.W.2d 70 (1995), which omitted the cause question, was upheld only because the court determined that the parties waived the issue. Indeed, the jury instruction on informed consent was revised following *Martin* because the committee believed that "the supreme court inferred it would

¶ 55. Here, the verdict not only omitted the cause question on informed consent, it omitted the first two questions as well. Thus, the jury was never asked whether the risk of stroke was information that a reasonable patient would want to know in deciding whether to submit to chiropractic treatment. The jury was never asked whether a reasonable patient in Hannemann's position would have submitted to chiropractic treatment if presented with such information. Finally, the jury was never asked whether the failure to inform Hannemann of the risk of a stroke was the cause of his injuries.

¶ 56. In sum, the verdict submitted, negligence in chiropractic treatment, did not cover the material issues of ultimate fact for informed consent. The circuit court erroneously proceeded on the theory that failure to provide informed consent constituted negligence in chiropractic treatment and not a separate basis for liability. Therefore, we conclude that the circuit court erroneously exercised its discretion in failing to submit a separate special verdict on informed consent.

C. Harmless Error

¶ 57. Having determined the circuit court erroneously exercised its discretion in failing to submit a separate special verdict on informed consent, we now address whether that error merits reversal. An error does not require reversal unless it affects the substantial rights of the party seeking to set aside the judg-

---

have found a fatal defect had it not been for its conclusion the parties waived such a causation question." Law Note, Wis JI—Civil 1023.1.

ment. Wis. Stat. § (Rule) 805.18(2). Thus, we must determine whether the error was prejudicial or harmless. *Town of Geneva v. Tills,* 129 Wis. 2d 167, 184–85, 384 N.W.2d 701 (1986). The test for harmless error in civil cases is the same as that in criminal cases. *Id.*

> To assess whether an error is harmless, we focus on the effect of the error on the jury's verdict. *State v. Harvey,* 2002 WI 93, ¶ 44, 254 Wis. 2d 442, 647 N.W.2d 189. . . . This test is " 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." '" *Harvey,* 254 Wis. 2d 442, ¶ 44 (quoting *Neder v. United States,* 527 U.S. 1, 15–16 (1999) quoting in turn *Chapman v. California,* 386 U.S. 18, 24 (1967)). We have held that "in order to conclude that an error 'did not contribute to the verdict' within the meaning of *Chapman,* a court must be able to conclude 'beyond a reasonable doubt that a rational jury would have [reached the same result] absent the error.' " *Id.,* ¶ 48 n.14 (quoting *Neder,* 527 U.S. at 18). In other words, if it is "clear beyond a reasonable doubt that a rational jury would have [rendered the same verdict] absent the error," then the error did not " 'contribute to the verdict.' " *Neder,* 527 U.S. at 15, 18 (citation omitted).

*State v. Weed,* 2003 WI 85, ¶ 29, 263 Wis. 2d 434, 666 N.W.2d 485 (alternations added).

¶ 58. Here, the jury returned a verdict finding that Boyson was negligent with respect to his treatment of Hannemann. Hannemann argues that even if the circuit court erred in failing to submit a separate special verdict on informed consent, such error was harmless because there was sufficient evidence to support the jury's verdict on negligent treatment. We reject Hannemann's argument that the error was not harmless for several reasons. First, the test for harmless

error is not "a sufficiency of the evidence standard." *Id.*, ¶ 28. The question is whether it is clear beyond a reasonable doubt that a rational jury would have found Hannemann liable for negligent treatment (the verdict actually rendered) had the circuit court properly submitted a separate special verdict on informed consent, such that it can be said beyond a reasonable doubt that the error did not contribute to the verdict obtained.

¶ 59. From the beginning of trial, Hannemann focused heavily on Boyson's alleged failure to disclose the risk of stroke and obtain informed consent as a basis for finding that Boyson's treatment of Hannemann was negligent. During voir dire, Hannemann repeatedly questioned jurors as to whether they thought it was "wrong" to expect a doctor to inform a patient as to the risks of a procedure and involve them in the process.[10] During opening statements, Hannemann again concentrated on Boyson's failure to obtain

[10] The following exchange took place between Hannemann's attorney and the jury panel:

> Mr. Peterson: When a doctor's procedure that he's going to employ in the treatment of a patient involves some inherent risk of harm, that the patient could be harmed by that procedure, do you think it's wrong to expect the doctor to talk to the patient to explain what the possibility of the harm is and involve the patient in the decision as to whether he should go ahead with that?

> (No response)

> Mr. Peterson: How about if the risk is a risk that's very rare; that it's a very remote risk; you know, it's very rare that this bad consequence, this bad thing that can happen actually does? I assume that everyone would think that the more rare and the more remote it is, the less important it would be to talk to the patient about that. Is there anyone who disagrees with that proposition?

> (No response)

proper informed consent. When discussing Hannemann's visit to Boyson on Saturday, August 23, Hannemann stated:

> Doctor Boyson was confused, concerned, and Dr. Boyson decided to do another adjustment, another what he calls chiropractic manual therapy. And he did what Gary will tell you—and what I think by the end of the trial you will agree—was the same adjustment that he always did, the same kind of adjustment as he always did. He didn't say to Gary this time, just like he didn't say any other time, Gary, I'm going to do an adjustment on your neck. And what he didn't do this time is, he didn't say, Gary, I'm going to do an adjustment on your neck despite the fact that you are exhibiting symptoms of having some serious neurological deficits. He didn't tell him that he was at peculiar risk, very high risk. He didn't tell him, these symptoms might go away if I don't adjust you. And he went ahead with the adjustment anyhow with Gary in the complete dark.

¶ 60. During trial, the parties presented conflicting evidence and disputed: 1) the cause of Hannemann's stroke; 2) whether Boyson actually performed an adjustment on August 23; 3) whether it was normal for chiropractors to warn of the risk of stroke; 4) whether the risk of stroke was extremely high or ex-

---

Mr. Peterson: How about this? How about if it's rare and remote, but what the consequence is, that you can be paralyzed or you can be killed as a consequence of what the doctor proposes to do? Even if its rare, is there anyone here that doesn't think that the patient should be consulted and told about that so that they can make a decision? They can participate in the decision as to whether whatever the problem is serious enough for them to confront being paralyzed, being killed? Anybody disagree with that?

(No response)

tremely low; 5) whether it is standard practice to perform a "George's Test" prior to an adjustment; 6) whether chiropractors can adequately test for susceptibility to neurovascular injury; and 7) whether Boyson informed Hannemann that he should see a medical doctor.

¶ 61. Both parties agreed that Boyson did not perform a "George's Test" on August 23, although Boyson stated he performed other tests that produced results similar to the "George's Test." Further, both parties agreed that at no point did Boyson warn Hannemann of the risk of neurovascular injuries, particularly stroke. Hannemann presented evidence that Boyson was negligent in that he should not have performed the alleged August 23 adjustment at all in light of the symptoms Hannemann was presenting.

¶ 62. More importantly, Hannemann's expert, Dr. Murkowski, opined that Boyson provided negligent treatment *because* he failed to obtain the proper informed consent. Some of the most powerful evidence came during the cross-examination of Boyson's expert, Dr. Wilder. Although Dr. Wilder testified on direct that he had no clinical criticism of Boyson's failure to disclose the risk of neurovascular injuries, he admitted on cross-examination that almost all chiropractic colleges utilized informed consent forms that disclosed that neurovascular injury was a remote risk of cervical adjustment. Dr. Wilder even admitted that the form he uses discloses such a risk. Thus, while Hannemann's evidence on negligent treatment was contradicted, his evidence on informed consent was compelling.

¶ 63. At the close of evidence, the circuit court separately instructed the jury on professional negligence in chiropractic treatment and informed consent. The court read a modified version of Wis JI—Civil

1023.8 Professional Negligence: Chiropractor-Treatment. The court also read a modified version of Wis JI—Civil 1023.2, governing medical informed consent.

¶ 64. During closing arguments, Hannemann argued that Boyson's treatment fell below the chiropractic standard of care because Boyson failed to perform the appropriate tests on Hannemann before administering the adjustment and because Boyson failed to disclose the risk of a stroke and thus failed to obtain proper informed consent.[11] However, by far, Hannemann's most extensive and emphatic arguments on liability concerned informed consent:

> What did the doctor not do? He didn't recognize the problem and he didn't inform on that Saturday morning, *he did not inform Gary Hannemann of the risk* that he was about to confront with another adjustment. *He did not tell him,* Gary it's a known fact that there is an association between cervical adjustment and people who have strokes. *He did not tell him you had developed very strange neurological symptoms* that may indicate that you're in the process of having a neurovascular injury. *He did not tell him there are options,* maybe you should go to a medical doctor, maybe we should do nothing.

> What he did is he decided to proceed with an adjustment, that is exactly what he did. . . . *He didn't talk to Gary about the risks.* He didn't do a complete neurological and orthopedic exam. . . . [H]e didn't tell Gary to get medical help.

(Emphasis added.)

---

[11] Hannemann also argued that Boyson was negligent because he did not tell Hannemann to go see a medical doctor. *But see Kerkman v. Hintz,* 142 Wis. 2d 404, 421, 418 N.W.2d 795 (1988)("[W]e hold that a chiropractor does not have a duty to refer a patient who is not treatable through chiropractic means to a medical doctor.").

701

¶ 65. Thus, throughout this entire trial, the jury was told that Boyson provided negligent treatment *because* he failed to obtain proper informed consent. The jury was informed by an expert witness and Hannemann's attorney that failure to obtain informed consent *was* negligent treatment because it was a violation of the standard of care. The circuit court, by instructing the jury as to negligent treatment and informed consent, but only submitting a special verdict on negligent treatment, reaffirmed the theory that failure to obtain informed consent violated the standard of care and constituted negligent treatment. While there was some argument that Boyson provided substandard treatment in failing to perform proper tests and that any cervical adjustment on a patient with Hannemann's symptoms would have constituted negligent treatment, the informed consent argument was by far the strongest, most extensive argument on liability put forth to the jury.

¶ 66. The circuit court and counsel for Hannemann both conflated the standards for negligent treatment with the standards for informed consent. As discussed *supra,* negligence in treatment is measured by the standard of care in the chiropractic community, i.e., what a reasonable chiropractor would do. In contrast, the obligation to obtain informed consent is measured by what risks a reasonable patient would want to know and whether a reasonable patient so informed would consent to the procedure. The jury was given two independent bases upon which to find liability, but was not required to find the ultimate material facts required for liability under one theory (failure to provide informed consent) and was further told that finding liability under that theory resulted in the liability under the other (negligent treatment). In essence,

the case was argued to the jury as an informed consent case but the jury was asked to submit a verdict on negligent treatment.

¶ 67. Given the nature of the error here, we cannot say beyond a reasonable doubt that a rational jury would have found that Boyson provided negligent treatment had a separate special verdict on informed consent been submitted. Simply put, we do not know why the jury found that Boyson provided negligent treatment. The legal error here is so intertwined with the verdict rendered that we cannot conclude beyond a reasonable doubt that a rational jury would have found Boyson provided negligent treatment absent the error. As such, we cannot conclude that the failure to separately submit a special verdict on informed consent did not contribute to the verdict that was obtained. Therefore, we cannot conclude that the error was harmless.

## V. CONCLUSION

¶ 68. In sum, we hold that negligent treatment and failure to obtain informed consent in the context of chiropractic malpractice are two different issues that require separate verdict questions. We conclude that although the practice of chiropractic and the practice of medicine are distinct health care professions, the obligation of the practitioners of both to disclose the risks of the treatment and care they provide should be the same. While the actual disclosures will inevitably vary between doctors and chiropractors, the nature of the duty and limitations thereon should be the same. A patient of chiropractic has the same right as a patient of medical practice to be informed of the material risks of the proposed treatment or procedure so that he may

make an informed decision whether to consent to the procedure or treatment. As such, we hold that the scope of a chiropractor's duty to obtain informed consent is the same as that of a medical doctor.

¶ 69. Furthermore, we conclude that the circuit court's failure to submit a separate special verdict on informed consent after separately instructing the jury on negligent treatment and informed consent constituted prejudicial error. We therefore affirm the decision of the court of appeals reversing part of the judgment of the circuit court and remanding the case for a new trial.[12]

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 70. DAVID T. PROSSER, J., did not participate.

¶ 71. LOUIS B. BUTLER, JR., J. (*dissenting*). The majority correctly concludes that negligent treatment and failure to obtain informed consent in the context of chiropractic malpractice are two different issues that require separate verdict questions. Majority op., ¶¶ 2, 68. I therefore join that portion of the decision relating to the scope of the chiropractor's duty to obtain informed consent. I also agree with and join the majority's conclusion that the circuit court's failure to submit a special verdict on informed consent after separately instructing the jury on negligent treatment and informed consent constituted error. Majority op., part IV.B. I write separately because I disagree with the majority's conclusion that the trial court's error in

---

[12] As the parties conceded during oral argument that the measure of damages is the same under either a negligence theory or an informed consent theory of liability, the trial on remand should be limited to the issue of liability.

failing to submit a special verdict on informed consent was prejudicial. Majority op., part IV.C. I therefore respectfully dissent.

¶ 72. The majority correctly notes that an error does not require reversal unless it affects the substantial rights of the party seeking to set aside the judgment. Majority op., ¶ 57. In determining whether the error is prejudicial or harmless, we apply the same test for harmless error in civil cases as in criminal cases. *Town of Geneva v. Tills,* 129 Wis. 2d 167, 184–85, 384 N.W.2d 701 (1986). Nevertheless, the harmless error test is not easy to articulate or apply. *See State v. Hale,* 2005 WI 7, ¶¶ 60–61 n.9, 277 Wis. 2d 593, 691 N.W.2d 637.

¶ 73. As I indicated in my concurring opinion in *Hale,* most constitutional errors[1] are analyzed using the basic harmless error test set forth in *Chapman v. California,* 386 U.S. 18, 24 (1967), *reh'g denied,* 386 U.S. 987 (1967). *Hale,* 277 Wis. 2d 593, ¶ 111 (Butler, J., concurring). For these types of errors, the analysis begins with an evaluation of the type of error and the harm it is alleged to have caused in order to determine whether the error did not contribute to the verdict obtained beyond a reasonable doubt. *Id.* The appropriate standard for such errors is not whether there is sufficient evidence, absent the error, to support the

---

[1] Examples of such errors include the following: Confrontation Clause violation (*Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986)); illegally seized evidence (*Fahy v. Connecticut,* 375 U.S. 85 (1963), and *Gilbert v. California,* 388 U.S. 263 (1967)); the right to consult with counsel (*Satterwhite v. Texas,* 486 U.S. 249 (1988)); involuntary confessions (*Arizona v. Fulminante,* 499 U.S. 279 (1991)); and comments on a defendant's silence (*Chapman v. California,* 386 U.S. 18 (1967), *reh'g denied,* 386 U.S. 987 (1967)).

verdict. *Id.* (citing *State v. Weed,* 2003 WI 85, ¶¶ 28–32, 263 Wis. 2d 434, 666 N.W.2d 485).

¶ 74. Some errors are considered "structural" in nature, and are considered so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case. *Id.,* ¶ 110 (citing *Chapman,* 386 U.S. at 23 n.8; *Delaware v. Van Arsdall,* 475 U.S. 673, 681 (1986); *Neder v. United States,* 527 U.S. 1, 8 (1999)). These errors include a complete denial of counsel,[2] a biased trial judge,[3] racial discrimination in the selection of a grand jury,[4] denial of self-representation at trial,[5] denial of a public trial,[6] and a defective reasonable-doubt instruction.[7] *Id.* (citing *Neder,* 527 U.S. at 8.)

¶ 75. A yet third classification of harmless error involves the type of error that by its very nature lends itself to a form of an "outcome determinative" approach. *See Id.,* ¶¶ 112–13. This third class of error includes ineffective assistance of counsel[8] and errors in jury instructions.[9] *Id.* For such errors, the court looks at whether there is a reasonable probability that the jury verdict would have been the same absent the error.[10] *Id.,* ¶ 112. A reasonable probability is one sufficient to

---

[2] *Johnson v. United States,* 520 U.S. 461, 468 (1997).

[3] *Tumey v. Ohio,* 273 U.S. 510 (1927).

[4] *Vasquez v. Hillery,* 474 U.S. 254 (1986).

[5] *McKaskle v. Wiggins,* 465 U.S. 168 (1984).

[6] *Waller v. Georgia,* 467 U.S. 39 (1984).

[7] *Sullivan v. Louisiana,* 508 U.S. 275 (1993).

[8] *Strickland v. Washington,* 466 U.S. 668 (1984).

[9] *Neder v. United States,* 527 U.S. 1 (1999); *Yates v. Evatt,* 500 U.S. 391 (1991); and *Pope v. Illinois,* 481 U.S. 497 (1987).

[10] While the burden of proof is normally on the beneficiary of the error in harmless error cases, it shifts to the defendant in

undermine confidence in the outcome. *Id. See also United States v. Bagley,* 473 U.S. 667, 682 (1985).

¶ 76. I conclude that the failure to submit a special verdict on the question of informed consent after separately instructing the jury on both negligent treatment and informed consent falls within the third class of harmless error. In looking at the nature of the error and the harm it is alleged to have caused, the failure to give a special verdict after instructing a jury on a specific issue more closely approximates the type of error in failing to instruct a jury in the first instance than other types of trial errors. In both situations, the jury has been deprived of certain information upon which to base its decision. Since we cannot look subjectively into the minds of the jurors[11] when an error occurs in the verdict form, I would apply the harmless error analysis adopted for jury instruction errors by the United States Supreme Court in *Neder* and by our court in *State v. Harvey,* 2002 WI 93, ¶ 47, 254 Wis. 2d 442, 647 N.W.2d 189. I would approach the inquiry by looking at whether the force of evidence, presumably considered by the jury in accordance with the instructions, was so overwhelming that we must conclude that the verdict would have been the same had the jury received the proper verdict form. *Hale,* 277 Wis. 2d 593, ¶ 113 (citing *Yates v. Evatt,* 500 U.S. 391, 404–05 (1991), (Butler, J., concurring).

¶ 77. This is not the first time our court has had to determine whether a jury verdict could be supported when the jury was faced with alternative methods of proof. In *State v. Crowley,* 143 Wis. 2d 324, 422 N.W.2d

ineffective assistance of counsel cases. *Compare Chapman,* 386 U.S. at 24, with *Strickland,* 466 U.S. at 694.

[11] *See Yates,* 500 U.S. at 404–05.

847 (1988), a jury found the defendant guilty of aggravated battery of a disabled person. *Id.* at 327. However, the State attempted to prove its case on alternate grounds, and it was not clear on which ground the jury convicted. First, the State tried to establish that the defendant's conduct directly created a high probability of great bodily harm. *Id.* at 328. Alternatively, the State contended that because the victim had a physical disability, if the evidence established the defendant's intent was to inflict bodily harm on a disabled person, then the defendant's conduct presumptively created a high probability of great bodily harm. *Id.*

¶ 78. This court concluded that when alternative methods of proof resting upon different evidentiary facts are presented to a jury, it is necessary for an appellate court to conclude that the evidence was sufficient under both of the alternative modes of proof in order to uphold the verdict. *Id.* at 329. While the court recognized that it was unclear which mode of proof the jury relied upon, the court nevertheless reasoned that it was obliged to search the record in an effort to determine whether the evidence was sufficient under each mode of proof. *Id.* at 331, 334. The court summarized the rule to be applied as follows: "[T]he rule . . . 'requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected.' " *Id.* at 334–35 (quoting from *United States v. Sales,* 725 F.2d 458, 459 (1984)). *See also Yates,* 354 U.S. 298; *Zant v. Stephens,* 462 U.S. 862 (1983); *Stromberg v. California,* 283 U.S. 359 (1931). The court ultimately concluded that there was sufficient evidence under either method or mode of proof to sustain the jury's verdict. *Crowley,* 143 Wis. 2d at 345.

¶ 79. Similarly, in *State v. Caldwell*, 154 Wis. 2d 683, 454 N.W.2d 13 (Ct. App. 1990), *petition for review denied*, 457 N.W.2d 324 (unpub. table decision) (1990), the court of appeals was confronted with a conviction for obstructing an officer. The trial court instructed the jury that the crime of obstructing could be committed in alternative ways: by making more difficult the performance of the officer's duties or by knowingly giving false information to the police with intent to mislead. *Id.* at 690. Citing *Crowley*, the court of appeals reasoned that for the resulting conviction to stand, the evidence would have to be sufficient under both modes of proof. *Id.* at 691. The court ultimately determined that the evidence was sufficient for the jury to convict under either theory of obstruction and affirmed the conviction. *Id.* at 692, 695.

¶ 80. Neither *Crowley* nor *Caldwell* was decided using a harmless error analysis. Nevertheless, both decisions provide an analytical framework that fits well under the harmless error test. Like this case, both cases involve a general verdict even though the jury was presented with alternative grounds for reaching its decision. We are not presented with a situation where the verdict is supportable on one ground, but not another, and it is impossible to tell which ground the jury relied upon. Instead, by determining whether there was sufficient evidence under either method of proof, this court necessarily reaches the question of whether the evidence is so overwhelming that we must conclude that the verdict would have been the same had the jury received the proper verdict form. *See Hale*, 277 Wis. 2d 593, ¶ 113 (citing *Yates*, 500 U.S. at 404–05), (Butler, J., concurring).

¶ 81. Ample evidence was offered at trial that Hannemann received negligent treatment from Boyson

following a chiropractic adjustment to his lower back and neck. Subsequent to the treatment, Hannemann developed numbness and tingling in his leg and under his foot. After complaining of the numbness, Boyson performed a second adjustment. Ultimately, Hannemann was unable to move one side of his body and experienced urinary tract problems. He was admitted to the emergency room and diagnosed as having suffered a stroke. Hannemann's expert witness testified that the treatment performed by Boyson fell below the chiropractic standard of care because Boyson did not perform a series of diagnostic tests that would indicate whether a patient was susceptible to neurovascular injury. While that evidence was disputed, we must resolve sufficiency of the evidence questions in the light most favorable to the verdict. *State v. Burkman,* 96 Wis. 2d 630, 643, 292 N.W.2d 641 (1980). I conclude that there was overwhelming evidence to support the jury's verdict with respect to the negligent treatment alternative.

¶ 82. Regarding informed consent, the evidence was undisputed that Boyson did not warn Hannemann that chiropractic treatment carried a risk of stroke or other neurovascular injuries. Hannemann's expert witness testified that there were no informed consent forms in the records. The expert testified that informed consent should include a warning to the patient that one of the risks of injury of chiropractic treatment includes stroke. Once again, while Boyson disputed the evidence, overwhelming evidence is present in the record that supports the jury's verdict with respect to the informed consent alternative.

¶ 83. Because the evidence is sufficient under either method of proof, I conclude that the error in failing to submit a special verdict to the jury on the

question of informed consent is harmless. I would therefore reverse the court of appeals, and affirm the trial court. Accordingly, I respectfully dissent.